**1258**

NATURAL RESOURCES DEFENSE COUNCIL, INC., Conservation Law Foundation of New England, Environmental Policy Institute, State of Maine, and State of Vermont, Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and United States of America, Respondents.

Arizona Nuclear Power Project, et al., Intervenors.

Carolina Power & Light Company, et al., Intervenors.

STATE OF VERMONT, Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and United States of America, Respondents.

Arizona Nuclear Power Project, et al., Intervenors.

Carolina Power & Light Company, et al., Intervenors.

STATE OF TEXAS, Petitioner,

v.

ENVIRONMENTAL PROTECTION AGENCY and Lee M. Thomas, Administrator, Respondents.

Arizona Nuclear Power Project, et al., Intervenors.

Carolina Power & Light Company, et al., Intervenors.

STATE OF MINNESOTA, By Its Attorney General Hubert H. HUMPHREY, III, Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.

Arizona Nuclear Power Project, et al., Intervenors.

Carolina Power & Light Company, et al., Intervenors.

Nos. 85–1915, 86–1096 to 86–1098.

United States Court of Appeals, First Circuit.

July 17, 1987.

As Amended Aug. 12, 1987.

Atty. Gen., State of N.C., S. Thomas Rhodes, Secretary, N.C. Dept. of Natural Resources and Community Development, and Michael J. Dowers, Atty. Gen., State of Georgia, were on brief for the States of Wis., Ga., and N.C., amici curiae.

David W. Zugschwerdt with whom Susan L. Smith, U.S. Dept. of Justice, F. Henry Habicht, II, Asst. Atty. Gen., Christopher C. Herman, U.S.E.P.A., Francis S. Blake, General Counsel, Alan W. Eckert, Associate General Counsel, and Charles S. Carter, Asst. General Counsel, were on brief, for respondents.

Renea Hicks, Asst. Atty. Gen., with whom Jim Mattox, Atty. Gen., Mary F. Keller, Executive Asst. Atty. Gen., for Litigation, Nancy N. Lynch, Chief, Environmental Protection Div., and Nancy E. Olinger, Asst. Atty. Gen., were on brief for petitioner, State of Tex.

Joseph G. Maternowski, Sp. Asst. Atty. Gen., with whom Jocelyn Furtwangler Olson, Sp. Asst. Atty. Gen., and Hubert H. Humphrey, III, Atty. Gen., were on brief, for petitioner State of Minn.

Scott A. Harman with whom Maurice Axelrad, Michael A. Bauser, Pamela A. Lacey and Newman & Holtzinger, P.C. were on brief, for intervenor utilities.

Before CAMPBELL, Chief Judge, ALDRICH and COFFIN, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

This is a petition to review the standards promulgated by the Environmental Protection Agency ("EPA") for the long-term disposal of high level radioactive waste under the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101–10226 (1982). The states of Maine and Vermont, and the Natural Resources Defense Council, Conservation Law Foundation of New England, and Environmental Policy Institute were the original petitioners. Later Minnesota and Texas also challenged the same standards in separate proceedings. All suits have been consolidated in this circuit. A coalition of

Dan W. Reicher with whom Charles Magraw, Jacqueline M. Warren, Natural Resources Defense Council, Armond Cohen, Conservation Law Foundation of New England, Merideth Wright, Asst. Atty. Gen., State of Vt., Suellen Keiner, Environmental Policy Institute, and Philip Ahrens, Asst. Atty. Gen., State of Me., Chief, Natural Resources Section, were on brief for petitioners Natural Resources Defense Council, Inc., Conservation Law Foundation of New England, Environmental Policy Institute, State of Me. and State of Vt.

Carl A. Sinderbrand, Asst. Atty. Gen., State of Wis., Bronson C. LaFollette, Atty. Gen., State of Wis., Lacy H. Thornburg,

nuclear power utilities has been permitted to intervene.

## I. STATUTORY BACKGROUND

The challenged standards were written by the EPA to regulate harmful releases into the environment from radioactive waste stored in repositories planned for its disposal. (The standards also regulate releases occurring while the waste is being managed prior to its disposal.)

The waste in question is derived from the fissioning of nuclear fuel in commercial nuclear power plants and in military reactors. Some of the material is first reprocessed so as to recover unfissioned uranium and plutonium. Reprocessing results in a transfer of most of the radioactivity into acidic liquids that are later converted into solid radioactive waste. Some spent nuclear fuel is not reprocessed and itself becomes a waste. Collectively this waste is called high level waste ("HLW"). It is extremely toxic and will maintain its toxicity for thousands of years.

Recognizing the need for repositories within which to dispose safely of the growing amounts of HLW, Congress in 1982 enacted the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. §§ 10101 *et seq.* The Act provides for a coordinated effort within the federal government to design, construct and operate nationally at least two HLW disposal facilities. 42 U.S.C. § 10134(2)(A). Without foreclosing other disposal methods, Congress focused in the NWPA on the creation of repositories located deep underground. These will depend on the surrounding underground rock formations together with engineered barriers, to contain safely the radioactivity from these wastes. *See* H.R.Rep. No. 491, 97th Cong., 2d Sess. 29–34, *reprinted in* 1982 U.S.Code Cong. & Admin.News 3792, 3795–3800.

The underground repositories are expected to be constructed using conventional mining techniques in geologic media such as granite, basalt (solidified lava), volcanic tuff (compacted volcanic ash) or salt. The solidified high level waste will be housed in canisters placed in boreholes drilled into the mine floor. When the repository is full, it will be backfilled and sealed. *See* Background Information Document for Final Rule at 4–1, 4–2.

In the NWPA, Congress prescribed a complex process for selecting the sites of the high level waste repositories. We shall summarize the selection process since it is relevant to an overall understanding of the standards in question. The Department of Energy ("DOE") begins the process by naming states containing "potentially acceptable sites." 42 U.S.C. § 10136(a). Within 90 days of identification, DOE must tell the governors and legislatures of the identified states where these sites are. Simultaneously, DOE must adopt guidelines for the selection of sites in various geologic media. 42 U.S.C. § 10132(a). DOE is then to apply the guidelines to the potentially acceptable sites and nominate at least five sites as suitable for characterization as candidate sites for the first repository. 42 U.S.C. § 10132(a), (b)(1)(A). Under this format, DOE in February of 1983 identified nine potentially acceptable sites (a Nevada site in tuff; a Washington site in basalt; two Texas sites in bedded salt; two Utah sites in bedded salt; one Louisiana site in a salt dome; and two Mississippi sites in salt domes). *See* Background Information Document for Final Rule at 4–2.

The Act required DOE to recommend to the President three of the nominated sites for detailed characterization studies. 42 U.S.C. § 10132(b)(1)(B). The President may then approve or disapprove a nominated site. 42 U.S.C. § 10132(c). In December 1984 DOE tentatively identified five sites for possible detailed site characterization. Three of these sites were formally recommended for detailed site characterization studies (Yucca Mountain site in Nevada; Deaf Smith County site in Texas; and the Hanford site in Washington). *See* Background Information Document at 4–5.

Nominated sites recommended to and approved by the President are then to be characterized by DOE. 42 U.S.C. § 10133. After conducting the detailed site characterization studies, DOE must make a rec-

ommendation to the President concerning the final site approval. Before DOE recommends a site it must hold public hearings, must notify any affected state or Indian tribe, and must prepare an environmental impact statement for each site to be recommended to the President. The President must then submit to Congress an endorsement of one site from the three sites characterized and recommended by DOE. 42 U.S.C. § 10134(a)(2)(A).

The site recommended by the President becomes the approved site for the first repository after 60 days, unless the affected state or Indian tribe submits to Congress a notice of disapproval. 42 U.S.C. § 10135(b). If such notice of disapproval is received, the site is disapproved unless, during the first 90 days after receipt of the notice, Congress passes a resolution of repository siting approval. 42 U.S.C. § 10135(c). The same site approval process is prescribed for the selection of a second federal repository site.

Several federal agencies share responsibility for building, licensing and laying down standards for the HLW repositories. The Department of Energy is to design, build and operate each federally owned repository. 42 U.S.C. § 10134. However, the Nuclear Regulatory Commission ("NRC") has responsibility to license the repositories. 42 U.S.C. § 10134(d). Under its licensure powers, the NRC regulates the construction of the repositories, licenses the receipt and possession of high level radioactive waste at the repositories, and authorizes the closure and decommissioning of repositories. *See* 42 U.S.C. § 10141(b).

The EPA also has a major regulatory role. The Act provides that EPA,

*pursuant to authority under other provisions of law,* shall, by rule, promulgate generally applicable standards for protection of the general environment from offsite releases from radioactive material in repositories.

42 U.S.C. § 10141(a) (emphasis added). The language, "pursuant to authority under other provisions of law," refers to the EPA's responsibility and authority under the Atomic Energy Act of 1954, 42 U.S.C. § 2201(b). The Reorganization Plan No. 3 of 1970 (which was the vehicle used by the executive branch to organize the newly formed Environmental Protection Agency), transferred to the EPA certain functions of the Atomic Energy Commission

to the extent that such functions of the Commission consist of establishing generally applicable environmental standards for the protection of the general environment from radioactive material.

Reorganization Plan No. 3 of 1970, 3 C.F.R. § 1072 (1966–70 compilation).

It is these generally applicable HLW environmental standards, recently promulgated by the EPA pursuant to the directive of the NWPA, which we are now called upon to review. DOE must follow these standards when siting, designing, constructing and operating the repositories. *See* 10 C.F.R. Part 960 (1987). The NRC must likewise obey them when licensing the repositories. *See* 10 C.F.R. Part 60 (1987). EPA's standards will also apply to defense-related DOE facilities (not licensed by the NRC) which store and dispose of defense-related waste.

## II. THE HIGH LEVEL WASTE ENVIRONMENTAL STANDARDS

The HLW environmental standards have two parts. Subpart A, 40 C.F.R. § 191.-01–.05 (1986), entitled "Environmental Standards for Management and Storage," sets individual exposure limits from radiation releases during the management, interim storage, and preparation for disposal of the radioactive wastes. Subpart A requires that the management and storage of HLW during this phase be conducted in such a manner as to provide reasonable assurances that the total annual exposure to any individual member of the public shall not exceed a stated limit (25 millirems to the whole body, 75 millirems to the thyroid, and 25 millirems to any other critical organ), 40 C.F.R. § 191.03. Subpart A also allows the EPA to issue alternative standards for waste management and storage operations at DOE disposal facilities that are not regulated by the NRC (*i.e.,*

DOE defense-related facilities), 40 C.F.R. § 191.04.

Subpart B, 40 C.F.R. § 191.11–.18 (1986), entitled "Environmental Standards for Disposal," is intended to ensure long-term protection of public health and the environment from releases of radiation *after* the HLW has been stored in the chosen manner. Although this subpart was developed having in mind storage at underground repositories, the standards are said to apply also to any other disposal method that may be chosen.[1]

Subpart B comprises four different types of environmental standards. The first type is the *general containment requirements*, 40 C.F.R. § 191.13. These require that nuclear waste disposal systems be designed to provide a reasonable expectation, based on performance assessment, that the cumulative releases of radiation to anywhere in the "accessible environment," for 10,000 years after disposal, shall not exceed certain designated levels.[2]

The term "accessible environment" is defined as the atmosphere; land surfaces; surface waters; oceans; and all of the "lithosphere" that is beyond the "controlled area." 40 C.F.R. § 191.12(k). The "lithosphere," as defined, includes the entire solid part of the earth below the surface, including any ground water contained within it. 40 C.F.R. § 191.12(j). The "controlled area" is the surface and underground area (and any ground water found therein) immediately surrounding the repository "that encompasses no more than 100 square kilometers and extends horizontally no more than 5 kilometers in any direction" from the disposed waste. 40 C.F.R. § 191.12(g).

These definitions taken together show that the general containment requirements limit the total, cumulative releases of radiation, for 10,000 years, anywhere in the environment, *outside the controlled area.* Within the controlled area itself, the general containment requirements are inapplicable and, therefore, they place no limits on radiation releases.

An example of how the general release limits apply is found in the limits for uranium. The repositories must be designed to give reasonable assurance that for the radionuclide uranium (and all its isotopes) the total radiation release, over a 10,000–year period, to the entire accessible environment (including any ground water) must be less than 100 curies (per 1,000 metric tons of heavy metal waste disposed of).[3] Similar limits are established for other radionuclides, *e.g.,* Americium–241, –243; Plutonium–238, –239, –240, –242. *See* Table of Release Limits for Containment Requirements, 40 C.F.R. Part 191, Appendix A (1986).

According to the EPA, the above general containment requirements constitute the principal protection mechanism of the HLW environmental standards. If cumulative releases are within these levels, overall adverse health effects upon the general population will be low. The EPA estimates that the general containment requirements limit population risks from the disposal of these wastes to "no more than the midpoint of the range of estimated risks that future generations would have been exposed to if the uranium ore used to create the wastes had never been mined." 50 Fed.Reg. 38,-072, col. 1 (Sept. 19, 1985).

The second type of environmental standard found in Subpart B is *the assurance*

---

**1.** The HLW environmental standards do not apply to disposal in or below the ocean since ocean disposal is prohibited by the Marine Protection, Research and Sanctuaries Act of 1972, 33 U.S.C. § 1414 (1982). Also, the environmental standards do not apply to radioactive wastes that have already been disposed of. *See* 50 Fed.Reg. 38,070, col. 3.

**2.** Because of inherent uncertainties over the long time period in question, the general containment requirements do not require complete assurance that the release limits will be met.

The performance assessments must show that the disposal system will have "a likelihood of less than one chance in 10 of exceeding" the set limits and that the disposal system will have "a likelihood of less than one chance in 1,000 of exceeding ten times" the set limits. 40 C.F.R. § 191.13.

**3.** A curie is the unit rate of radioactive decay: the quantity of any radionuclide which undergoes $3.7 \times 10^{10}$ disintegrations per second.

*requirements,* 40 C.F.R. § 191.14. These are a kind of practical backup to the cumulative release requirements just mentioned.

The assurance requirements provide, among other things, that "active institutional controls" over disposal sites be maintained for as long a period of time as is practicable after disposal. 40 C.F.R. § 191.14(a). (Active institutional controls include actions like controlling public access to a site, performing maintenance operations and cleaning up releases.) Other facets of the assurance requirements are as follows: that disposal arrangements be monitored in the future to detect deviations from expected performance, 40 C.F.R. § 191.14(b); that there be permanent markers, records and archives (so-called "passive institutional controls") to indicate to future generations the presence and location of the dangerous waste, 40 C.F.R. § 191.14(c); that disposal systems not rely on just one type of barrier to isolate waste, but rather employ both engineered and natural barriers, 40 C.F.R. § 191.14(d); that repository sites be selected that avoid areas where it is reasonable to expect future exploration for scarce or easily accessible resources, 40 C.F.R. § 191.14(e); that disposal systems be such that, for a reasonable time after disposal, most of the radioactive waste can be removed, 40 C.F.R. § 191.14(f).

The assurance requirements are applicable only to disposal facilities that are not regulated by the NRC (*i.e.,* certain DOE national defense-related facilities) because in its comments on the originally proposed rule, the NRC objected to inclusion of the assurance requirements, arguing that they transcended the EPA's authority to set generally applicable environmental standards. The NRC felt that the assurance requirements were not environmental standards at all but rather were simply ways of ensuring compliance with environmental standards. Since it is the NRC's responsibility to make sure that the repositories comply with the different regulations, the NRC saw the EPA's assurance requirements as an intrusion upon the NRC's jurisdiction. The agencies ultimately resolved the dispute by (1) making the EPA's assurance requirements applicable only to facilities not licensed by the NRC, and (2) by having the NRC modify its regulations where necessary to incorporate the essence of the EPA's assurance requirements. *See* 50 Fed.Reg. 38,072, col. 3.

When the EPA published a first draft of its standards, Subpart B only included the two standards so far described (general containment requirements and assurance requirements). *See* Proposed Rule, 40 C.F.R. Part 191, 47 Fed.Reg. 58,196 (Dec. 29, 1982). The EPA at first believed that these two proposed standards—aimed to keep the total radiation release over a 10,-000–year period below specified safe limits—would suffice. Later, however, it was persuaded to add so-called *individual protection* requirements, to deal with the possibility that radioactivity might be concentrated in specific areas. Release limits designed to protect individuals were thought necessary because, while overall releases to the environment as a whole would be within tolerable limits, particular individuals might end up being exposed to excessively large doses of radiation: for example, radiation from waste eventually released into, and concentrated in, ground water that is in the immediate vicinity of a repository. The EPA explained that

Since ground water generally provides relatively little dilution, anyone using such contaminated ground water in the future may receive a substantial radiation exposure (e.g., several rems per year or more). This possibility is inherent in collecting a very large amount of radioactivity in a small area.

*See* 50 Fed.Reg. 38,077, col. 3. Therefore, after the notice and comment period, two additional provisions, the individual protection requirements, and the ground water protection requirements, were added to Subpart B of the final rule. These were mainly intended to protect individuals located near a repository who might be exposed to contamination emanating from the site.

The *individual protection requirements,* 40 C.F.R. § 191.15, require that dis-

posal systems be designed to provide a reasonable expectation that, for 1,000 years after disposal, the annual radiation exposure to *any member of the public* in the accessible environment shall not exceed 25 millirems to the whole body or 75 millirems to any organ. The standard requires that in assessing the anticipated performance of a repository, all potential so-called "pathways" of radiation releases from the repository must be considered. The term "potential pathway" represents the expected scenario of how the released radioactivity will travel from the repository to the accessible environment and ultimately to individuals. There are various possible pathways which could result in exposures to individuals. These possible pathways include, for example, direct releases via seepage to the land surface and then to food crops ingested by man; or similar releases travelling to a river or to an ocean and then to fish which man would ingest; or releases to ground water that is used for drinking. *See* Background Information Document for Final Rule at Chapter 7.

As discussed above, the Agency was concerned about individual exposures especially because of the possibility that radiation might be released to and become concentrated in ground water, some of which might permeate even the rock surrounding a repository and might find its way, in time, to supplies of ground water beyond the site. Since ground water contaminated by seepage from the site might be used for drinking water, the individual protection requirements expressly require that in determining whether a repository will comply with the annual exposure limits, the assessments must assume that individuals consume all their drinking water (two liters per day) from any "significant source" of

ground water[4] outside of the controlled area. This express requirement places an indirect limit on releases to ground water outside of the controlled area (the "controlled area" being, as already described, the area occupied by the repository and a specified surface and below-ground area surrounding the repository, *see* definition *supra* ).

The fourth section of Subpart B is the special source *ground water protection requirements*, 40 C.F.R. § 191.16. The term "ground water protection requirements" is somewhat misleading. The provision does not protect ground water generally but only ground water of a very special type within or very near "controlled areas." Thus these requirements apply only to Class I ground waters, as defined by the EPA's Ground-Water Protection Strategy,[5] that also meet the following three conditions:

(1) They are within the controlled area or near (less than five kilometers beyond) the controlled area; (2) they are supplying drinking water for thousands of persons as of the date that the Department [of Energy] selects the site for extensive exploration as a potential location of a disposal system; and (3) they are irreplaceable in that no reasonable alternative source of drinking water is available to that population.

*See* 40 C.F.R. § 191.12(n).

The radiation concentration limits set by this rule are similar to the maximum radiation concentration limits established under the Safe Drinking Water Act, 42 U.S.C. §§ 300f–j, for community water systems. *See* 40 C.F.R. Part 141. As with the individual protection requirements, the ground water protection requirements will apply only for the first 1,000 years after disposal.

---

4. A "significant source" of ground water is defined in the standard so as to identify an underground water source of sufficient quantity and quality that it would be able to supply a community water system (as that term is used in the regulations pertaining to the Safe Drinking Water Act). *See* 40 C.F.R. § 191.12(n).

5. The Ground-Water Protection Strategy (published in August 1984) is, in effect, an in depth policy statement which is designed to help provide consistency and coordination among the many EPA programs that relate either directly or indirectly to ground water quality. As such, it was not adopted through rulemaking, but rather is intended to be implemented through

Class I ground waters [6] are defined as ground waters that are highly vulnerable to contamination because of local hydrological characteristics and that are also either irreplaceable (*i.e.*, there is no reasonable alternative source of drinking water) or vital to a particularly sensitive ecological system. Environmental Protection Agency, Ground-Water Protection Strategy at 5–6 (August 1984).

The ground water protection requirements thus apply to an extremely narrow category of ground water found within, or within five kilometers of, the repository site. The Agency explained that the ground water protection requirements provision is necessary and adequate to avoid any significant degradation of this important ground water resource. *See* 50 Fed. Reg. 38,074 (Sept. 19, 1985). The practical effect of these requirements seems less to provide ongoing regulation than simply to deter the choosing of a site containing ground water of this especially valuable kind upon which "thousands of persons" already depend. If this were the real purpose, however, the EPA did not say so in so many words.

### III. OUR STANDARD OF REVIEW

 In reviewing the above described standards,[7] which were promulgated pursuant to notice and comment rulemaking, *see* 5 U.S.C. § 553(c) (1982), we must make sure that the Agency followed proper procedures in developing the final standards and that the Agency acted within its statutory authority. *South Terminal Corp. v. EPA*, 504 F.2d 646, 655 (1st Cir.1974). If so, we will invalidate the standards only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." 5 U.S.C. § 706(2)(A) (1982). In reviewing administrative actions, courts will look to see whether the agency has adequately explained the facts and policies upon which it relied. *BASF Wyandotte Corp. v. Costle*, 598 F.2d 637, 652 (1st Cir.1979), *cert. denied*, 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980); *National Nutritional Foods Association v. Weinberger*, 512 F.2d 688, 701 (2d Cir.) (agency obliged to publish statement of reasons for conclusions that will be sufficiently detailed to permit judicial review), *cert. denied*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975). Reviewing courts also require that the facts relied upon have some supporting basis in the administrative record. *BASF Wyandotte Corp.*, 598 F.2d at 652. If these requirements are satisfied, we will not substitute our judgment for that of the agency. Objections to the merits of the standards are outside our province unless it is shown that the agency's decision was not based on relevant factors or was a clear error of judgment. *South Terminal Corp.*, 504 F.2d at 655. We will delve into the soundness of the agency's reasoning only to ascertain that the conclusions reached are rationally supported. *Id.* at 655 n. 5.

In their challenge to the HLW standards, petitioners raise numerous and varied objections. The Natural Resources Defense Council ("NRDC"), among others, charges that the individual and ground water protection requirements are not in accordance with law since the EPA has violated a duty under the Safe Drinking Water Act to prevent the endangerment of drinking water by underground injection.

---

the various EPA regulatory programs that involve ground water.

**6.** Class II ground waters are defined as all other ground water that is currently used or potentially available for drinking water or other beneficial use. *See* Ground-Water Protection Strategy at 6. This class comprises most of the usable ground water in the United States. *Id.* at 45. Class III ground waters are ground water supplies that are not considered as potential sources of drinking water because of heavy salinity or other contamination. *Id.* at 6.

**7.** Our jurisdiction over this petition is conferred by 42 U.S.C. § 2239(b) (1982), which authorizes judicial review of final orders under the Atomic Energy Act. *See Quivira Mining Co. v. United States*, 728 F.2d 477 (10th Cir.1984) (judicial review provision applies to final orders of EPA promulgated pursuant to EPA's authority under Atomic Energy Act and Reorganization Plan No. 3 of 1970).

The state of Texas claims that in enacting the ground water protection requirements, the EPA has failed to provide legally adequate notice and comment procedures. In addition to these two broad attacks on the standards, all the petitioners raise numerous other claims. They contend, inter alia, that certain aspects of the standards are either irrational or arbitrary; are not supported in the record; or are not adequately explained by the agency. Because of the nature and complexity of these standards, many of these complaints are interrelated and overlap. We shall now consider the various claims, turning first to the contention that EPA has violated the Safe Drinking Water Act.

IV. DO EPA'S REGULATIONS VIO-
 LATE THE SAFE DRINKING
 WATER ACT?

Part C of the Safe Drinking Water Act, 42 U.S.C. § 300h (1982) ("SDWA"), indicates that the EPA has a duty to assure that underground sources of drinking water will not be endangered by any underground injection. Petitioners argue here that endangerment of such drinking water is bound to result if HLW is disposed of, underground, under standards no more stringent than the EPA's current HLW regulations. Since violations of the SDWA are inevitable, so petitioners argue, the present regulations are "not in accordance with law" and hence invalid.

To understand this argument we must first look at the SDWA, an Act which preceded the NWPA. The SDWA was enacted in 1974 to assure safe drinking water supplies, protect especially valuable aquifers,[8] and protect drinking water from contamination by the underground injection of waste. The SDWA required the EPA to promulgate standards to protect public health, by setting either (1) maximum contaminant levels for pollutants in a public water supply, or (2) a treatment technique to reduce the pollutants to an acceptable

level if the maximum contaminant level is not economically or technologically attainable. Maximum contaminant levels are to be established at a level having no known or adverse human health effect, with an adequate margin for safety. 42 U.S.C. § 300g–1(b)(1)(B). The EPA has established maximum contaminant levels for man-made radionuclides, see 40 C.F.R. § 141.16, as well as a maximum contaminant level for naturally occurring radium, see 40 C.F.R. § 141.15.

These standards apply to "public water systems" which regularly supply water to 15 or more connections or to 25 or more individuals at least 60 days per year. 42 U.S.C. § 300f(4); 40 C.F.R. § 141.1(e). The public water system has the responsibility to make sure the water it supplies meets these limits. In effect, the community water system must either clean up existing water if below standard, or find a new water supply which meets the maximum contaminant levels. The EPA is given certain powers to enforce its standards. 42 U.S.C. § 300g–3(b).

The SDWA also authorizes EPA to designate, on its own initiative or upon petition, an area as having an aquifer which is the sole source of the area's water supply and which would create a significant hazard to public health if contaminated. Once an area is so designated, no federal assistance may be provided for any project in the area which EPA determines may contaminate the aquifer. See 42 U.S.C. § 300h–3(e).

The SDWA's only provision for directly regulating pollution-causing activities is found in Part C, 42 U.S.C. § 300h. There Congress sought to protect underground sources of drinking water from what are termed "underground injections." Underground injection is the subsurface emplacement of contaminating fluids[9] by well injection. 42 U.S.C. § 300h(d)(1). Part C requires the EPA to promulgate regula-

---

8. An aquifer is an underground geologic formation, group of formations, or part of a formation that is capable of yielding a significant amount of water to a well or spring. See 40 C.F.R. § 146.3 (1986).

9. EPA's regulations define "fluid" as "any material or substance which flows or moves whether in a semisolid, liquid, sludge, gas, or any other form or state." 40 C.F.R. § 144.3.

tions governing underground injection control programs.

The EPA is directed to publish a list of each state for which an underground injection control program would be necesary to assure that underground injection would not endanger drinking water sources. 42 U.S.C. § 300h–1(a). The EPA has listed *all* states as needing underground injection control programs. 40 C.F.R. § 144.1(e).

The EPA is also required to promulgate regulations governing state underground injection control programs to ensure that the state programs prevent underground injection which could endanger drinking water sources. 42 U.S.C. § 300h(a)(1), (b)(1). If a state program does not comply with the EPA's regulations, the EPA itself is to promulgate a regulatory program for that state and enforce compliance. 42 U.S.C. § 300h–1(c). To be approved by EPA, a state control program has to meet certain standards. It must prevent underground injection unless authorized by permit or rule; it may authorize underground injection only where it is demonstrated that the injection will not endanger drinking water sources; and it shall include inspection, monitoring, recordkeeping and reporting requirements. 42 U.S.C. § 300h(b)(1)(A)–(C). State regulatory programs (as well as any EPA regulations for non-complying states) apply to underground injections by federal agencies as well as all others. 42 U.S.C. § 300h(b)(1)(D).

In requiring EPA to regulate state underground injection control programs, Congress restrained the EPA's authority in several ways in order to accommodate existing state programs and avoid disrupting oil and gas production. EPA's regulations may not interfere with or impede the production or recovery of oil or natural gas, *unless* such requirements are essential to assure that underground sources of drinking water will not be endangered by such injection. 42 U.S.C. § 300h(b)(2). EPA's regulations are to reflect the variations in geologic, hydrological or historical conditions between the states. 42 U.S.C. § 300h(b)(3)(A). To the extent feasible,

EPA is not to promulgate rules which unnecessarily disrupt state underground injection control programs that were earlier in effect. 42 U.S.C. § 300h(b)(3)(B). Congress made it clear, however, that, despite the deference the EPA was to afford the states, the goal of protecting underground drinking water was to be preeminent. The SDWA states,

> Nothing in this section shall be construed to alter or affect the duty to assure that underground sources of drinking water will not be endangered by any underground injection.

42 U.S.C. § 300h(b)(3)(C). This language in particular, petitioners say, establishes that the EPA has an overriding statutory mandate, unaffected by the NWPA, to protect underground drinking water against endangerment.

The SDWA defines what is meant by the term "endanger":

> Underground injection endangers drinking water sources if such injection may result in the presence in underground water which supplies or can reasonably be expected to supply any public water system of any contaminant, and if the presence of such contaminant may result in such system's not complying with any national primary drinking water regulation or may otherwise adversely affect the health of persons.

42 U.S.C. § 300h(d)(2).

Petitioners assert that the EPA, in promulgating the HLW standards, has violated this so-called "no endangerment mandate" because its rules will allow underground injections that result in radiation contamination of underground drinking water supplies.

Analysis of petitioners' argument requires us to address several questions: (1) whether storage of HLW in underground repositories will constitute an "underground injection" as that term is used in the SDWA; (2) whether the EPA's HLW standards sanction activities that will "endanger drinking water," as that phrase is used in the SDWA; and (3) whether, if the two previous questions are answered in the affirmative, EPA's HLW regulations are

contrary to law or, if not, are nonetheless arbitrary and capricious. We shall deal with each of these questions in turn.

(1) Does Storage Of HLW In Underground Repositories Constitute Underground Injection?

What petitioners call the no endangerment provision of the SDWA, 42 U.S.C. § 300h(b)(3)(C), indicates that the EPA has a duty "to assure that underground sources of drinking water will not be endangered by any underground injection." For the Agency to have violated that duty by adopting the present HLW regulations, it is necessary that the proposed placing of HLW in underground repositories constitute an "underground injection." The SDWA defines underground injection as the "subsurface emplacement of *fluids* by *well injection.*" 42 U.S.C. § 300h(d)(1) (emphasis added). The EPA, in its regulations enacted pursuant to the SDWA, has defined the terms "fluids" and "well injection."

Well injection is the "subsurface emplacement of fluids through a bored, drilled or driven well; or through a dug well, where the depth of the dug well is greater than the largest surface dimension." 40 C.F.R. § 146.3.

The Department of Energy, in its Mission Plan, has described how the HLW will be disposed of underground. The HLW will be removed from transportation casks, packaged and then transferred underground through the waste-handling shaft. "Once underground, the wastes will be emplaced in boreholes...." Mission Plan at 33. Thus it seems that waste will be "emplaced underground through a bored, drilled or driven shaft."

The EPA has defined the term "fluids" broadly as including a "material or substance which flows or moves whether in a semi-solid, liquid, sludge, gas or any other form or state." 40 C.F.R. § 146.3. This definition was taken directly from the legislative history which made it clear that "[t]he definition of 'underground injection' is intended to be broad enough to cover any contaminant which may be put below

ground level and which flows or moves, whether the contaminant is in semi-solid, liquid, sludge, or any other form or state." H.R.Rep. No. 1185, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 6454, 6483. The definition of high level waste in the NWPA shows that at least some of the waste material to be disposed of originates in a liquid form.

The term "high-level radioactive waste" means—

(A) the highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations....

42 U.S.C. § 10101(12). According to the EPA, the waste to be stored underground will be converted, before storage underground, into a solid. *See* Background Information Document at 3–4. This does not mean that the contemplated waste disposal system is not an underground injection, since the definition of fluids (following the directive in the legislative history, *see supra*) is very broad and includes waste "in any other form or state" if it flows or moves. 40 C.F.R. § 146.3. The dangerous component of this waste, *i.e.*, the radiation, regardless of whatever "form or state" it is emitted from, will flow or move, thus having the capacity to do harm to drinking water sources far distant from the original site as more conventional injected fluids would do. The HLW waste rules "apply to radionuclides that are projected to move into the 'accessible environment' during the first 10,000 years." *See* Preamble, 50 Fed. Reg. 38,071, col. 2. The definition of "barrier" in the regulations includes a structure which prevents or substantially "delays movement" of water or radionuclides toward the accessible environment. 40 C.F.R. § 191.12(d).

The Arizona Nuclear Power Project, et al., intervenors in this case, argue that disposal of this radioactive waste underground is not the "type" of underground disposal that Congress was concerned with when it enacted Part C of the SDWA. In-

tervenors claim that the type of underground injection which disturbed Congress was a method whereby contaminants were injected into the subsurface and allowed to disperse freely into the general environment. Intervenors assert that the type of disposal contemplated by the HLW rules is different because the waste will be packaged in containers, and will be surrounded by barriers that are designed to isolate this waste from the environment. Thus, they conclude, Part C does not apply to this disposal system.

While Congress may have been especially concerned with a different type of underground disposal when it passed Part C of the SDWA, this does not negate its overall intent to protect future supplies of drinking water against contamination. Unusable ground water is unusable ground water no matter whether the original source of the pollution arrived in a loose, free form manner, or in containers injected into the ground. We find no language in the SDWA showing that Congress meant to regulate only certain forms of underground pollution, while overlooking other forms of contamination of ground water via underground injection. Indeed, the legislative history indicates that the phrase "underground injection which endangers drinking water sources" was to have the broadest applicability:

> It is the Committee's intent that the definition be liberally construed so as to effectuate the preventative and public health protective purposes of the bill. The Committee seeks to protect not only currently-used sources of drinking water, but also potential drinking water sources for the future....

> The Committee was concerned that its definition of "endangering drinking water sources" also be construed liberally. Injection which causes or increases contamination of such sources may fall within this definition even if the amount of contaminant which may enter the water source would not by itself cause the maximum allowable levels to be exceeded. The definition would be met if injected material were not completely contained in the well, and if it may enter either a present or potential drinking water source, and if it (or some form into which it might be converted) may pose a threat to human health or render the water source unfit for human consumption.

H.R.Rep. No. 1185, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News at 6484.

■ We believe that the narrow and constrained reading of Part C of the SDWA advocated by intervenors would do violence to the intent of Congress. We decline that reading.

We conclude that the primary disposal method being considered, underground repositories, would likely constitute an "underground injection" under the SDWA.

(2) Do The Regulations Under Review Sanction Activities That Will "Endanger Drinking Water"?

■ Part C of the SDWA, 42 U.S.C. § 300h(b)(3)(C), speaks of the EPA's duty "to assure that underground sources of drinking water will not be *endangered* by any underground injection." (Emphasis supplied.) Assuming, as discussed above, that the planned disposal of HLW in underground repositories amounts to "underground injection," will such injection, if carried out under the EPA's current HLW standards, "endanger" underground sources of drinking water? We believe the answer is "yes."

As noted, the term "endanger" is defined in the SDWA to include any injection which may result in the presence "in underground water which supplies or can reasonably be expected to supply any public water system of any contaminant ... if the presence of such contaminant may result in such system's not complying with any national primary drinking water regulation." 42 U.S.C. § 300h(d)(2). Measured against this definition, the HLW standards permit contamination of most categories of underground water within the so-called controlled area without restriction of any type. More fundamentally, they permit water supplies *outside* the controlled area to be contaminated by radiation up to individual

exposure levels that exceed the levels allowed in national primary drinking water regulations. It follows that the HLW regulations under review not only do not "assure" the non-endangerment of underground sources of drinking water, but sanction disposal facilities allowing certain levels of endangerment as that term is used in the SDWA. We shall now discuss our conclusions in greater detail.

### A. Endangerment In Controlled Area

The two major components of the HLW rules, the general containment requirements and the individual protection requirements, *supra,* set limits on radiation releases to every part of the earth, including ground water, beyond the area under direct control of those in charge of disposing of this waste (referred to as the controlled area). These requirements have various release limits (depending on which rule is involved, *i.e.,* the limits of the general containment requirements are of a different type from those of the individual protection requirements) which apply outside the controlled area, but neither sets limits on contamination of ground water within the controlled area. A further component, the special source ground water protection requirements, sets limits on releases to certain ground water supplies found within the controlled area, or within five kilometers of the controlled area. However, this rule applies to only a very special class of ground water.

Thus, while the ground water outside the controlled area is covered by both the general containment requirements and the individual protection requirements (the sufficiency of which we shall later address), there is essentially no protection of ground water within the controlled area (other than the specific ground water rule, *infra,* with its highly limited applicability). This is because the general containment and individual protection requirements apply only to releases to the accessible environment. The accessible environment is defined as "(1) the atmosphere; (2) land surfaces; (3) surface waters; (4) oceans; and (5) *all of the lithosphere that is beyond the controlled area.*" 40 C.F.R. § 191.12(k). Lithosphere is defined as the solid part of the earth below the surface, including any ground water contained within it. 40 C.F.R. § 191.12(j). Controlled area is defined as: (1) A surface location, to be identified by passive institutional controls, that encompasses no more than 100 square kilometers and extends horizontally no more than five kilometers in any direction from the outer boundary of the original location of the radioactive wastes in a disposal system; and (2) the subsurface underlying such a surface location. 40 C.F.R. § 191.-12(g).

■ Thus the two broadly applicable rules (general containment and the individual protection requirements) set some limits on radiation releases to every part of the earth, including the ground water, except within the controlled area, *i.e.,* the part of the earth immediately surrounding the repository. This means that any ground water found within the controlled area (except the special water protected under the ground water protection requirements) may be contaminated without limit. The administrator has explained that the definition of "accessible environment,"

> was intended to reflect the concept that the geologic media surrounding a mined repository are part of the long-term containment system, with disposal sites being selected so that the surrounding media prevent or retard transport of radionuclides through ground water. Such surrounding media would be dedicated for this purpose, with the intention to prohibit incompatible activities (either those that might disrupt the disposal system or those that could cause significant radiation exposures) in perpetuity. Applying standards to the ground water contained within these geologic media surrounding a repository would ignore the role of this natural barrier, and it could reduce the incentive to search for sites with characteristics that would enhance long-term containment of these wastes.

50 Fed.Reg. 38,077, col. 1. The administrator further explained that the accessible environment

does not include the lithosphere (and the ground water within it) that is below the "controlled area" surrounding a disposal system. The standards are formulated this way because the properties of the geologic media around a mined repository are expected to provide much of the disposal system's capability to isolate these wastes over these long time periods. Thus, a certain area of the natural environment is envisioned to be dedicated to keeping these dangerous materials away from future generations and may not be suitable for certain other uses. 50 Fed.Reg. 38,071, col. 2. Hence the regulations under review deliberately expose the ground water in the controlled area to contamination in the belief that the controlled area may appropriately be used in this manner to keep the dangerous high level wastes "away from future generations." There can be little doubt, therefore, that the current HLW standard allows "endangerment," as the term is used in the SDWA, of most kinds of drinking water sources *in the controlled area.* However, as we later discuss, the EPA's choice to sacrifice the purity of water at repository sites as part of the control strategy was impliedly sanctioned by Congress when, subsequent to passage of the SDWA, it enacted the Nuclear Waste Policy Act. We accordingly find no illegality. (Our conclusion in this regard is discussed in a later part of this opinion.)

While unlimited "endangerment" of most waters is thus allowed (albeit permissibly) within the controlled area, there is within the controlled area one special category of ground water which, as we have seen, receives special protection. The special source ground water protection requirements afford protection to Class I ground water of certain types in and close to (within five kilometers of) the controlled area. The ground water requirements limit the radionuclide concentrations in these Class I waters for 1,000 years to no more than concentration limits similar to those established for community water systems under the SDWA. That is, this standard sets limits that are compatible with the maximum contaminant level for man-made radi-

ation set under the SDWA. Thus, when applicable, the special source ground water protection requirements comply with the no endangerment policy expressed in Part C of the SDWA since they exactly parallel the limits set by the EPA under the SDWA. However, the ground water protection requirements apply only to so-called "Class I" ground water (as defined in the EPA's Ground-Water Protection Strategy published in August 1984). In addition, they apply only to those "Class I" waters which also meet the following conditions:

(1) They are within the controlled area or near (less than five kilometers beyond) the controlled area; (2) they are supplying drinking water for thousands of persons as of the date that the Department [of Energy] selects the site for extensive exploration as a potential location of a disposal system; and (3) they are irreplaceable in that no reasonable alternative source of drinking water is available to that population.

Clearly, the applicability of the special source ground water protection requirements is very much restricted. Petitioners, indeed, make much of this. They assert that this rule violates the SDWA's no endangerment policy since it protects so limited a class of water within so small an area, omitting the great bulk of the nation's usable ground water.

But while petitioners are doubtless right concerning the narrow scope of this provision, their criticism fails to take account of the EPA's strategy of dedicating the geologic media *within the controlled area* (including any ground water found within such geologic media) to serve as a part of the containment mechanism. The EPA obviously intended the special source ground water rule to provide protection only to a small category of ground water deemed to be so valuable that it should not be used for containment purposes. As the Agency assumed that ground water within the controlled area will be part of the containment mechanism, and that therefore a direct limit on releases to ground water within the controlled area is an exception to the general approach, it is understandable that any

ground water requirements *within the controlled area* would have a very limited applicability.

These ground water requirements will likely serve more as a deterrent to siting repositories at places containing valuable ground water resources of this description than as a protective mechanism at actual repositories (where the special ground water covered by the ground water rule is unlikely to be present). Moreover, the ground water requirements have no effect more than five kilometers beyond the controlled area. It follows that there will likely be no protection to ground water within an actual controlled area site.

### B. Endangerment Beyond Controlled Area

We turn next to the larger issue of whether the HLW regulations permit "endangerment" as defined in the SDWA of underground drinking water sources *beyond* the controlled areas. As just discussed, the special source ground water requirements do not apply at all outside the repository site and five kilometers beyond. The individual protection requirements, however, while not a ground water rule as such, give a considerable measure of protection to ground water outside the controlled area.[10]

The individual protection requirements are designed to protect individuals in the vicinity of a disposal system by setting annual individual exposure limits effective for 1,000 years. (This contrasts with the general containment release limits which are designed to reduce risks to the general population through standards which limit the cumulative release of radiation for 10,-000 years anywhere in the accessible environment.) The Agency added the individual protection requirements because, although it felt that the general containment

requirements would ensure that the overall population risks to future generations would be acceptably small, it also felt that individuals near the repositories might receive substantially greater exposure to radiation than the average person. While overall releases from a repository could be within the total cumulative release limits of the general containment requirements, there might be nearby localities where the radiation would be concentrated, and thus pose a substantial risk to some individuals. As the Agency explained in the preamble to the HLW rules:

> Even with good engineering controls, some waste may eventually (*i.e.*, several hundreds or thousands of years after disposal) be released into any ground water that might be in the immediate vicinity of a geologic repository. Since ground water generally provides relatively little dilution, anyone using such contaminated ground water in the future may receive a substantial radiation exposure (e.g., several rems per year or more). This possibility is inherent in collecting a very large amount of radioactivity in a small area.

50 Fed.Reg. 38,077, col. 3. To avoid this problem the Agency added the individual protection requirements.

The individual protection requirements limit the annual exposure from the disposal system to any individual member of the public for the first 1,000 years to no more than 25 millirems to the whole body, or 75 millirems to any organ. This limit applies outside the controlled area. Inherent in the individual protection requirements is an indirect protection of ground water because in assessing compliance with this requirement, all potential pathways of radiation from the repository to individuals must be considered, and the assumption must be

---

**10.** The general containment requirements also theoretically provide some protection of ground water because these limits apply to releases anywhere in the accessible environment, including ground water beyond the controlled area. However, the connection between the general containment requirements and the no endangerment policy is an attenuated one, at best. The general containment requirements are designed

to reduce overall population risks by setting cumulative release limits over the full 10,000-year period, while the maximum contaminant levels of the SDWA are designed to protect individuals against harm from drinking water. It would be impracticable to force the EPA to harmonize these two regulatory schemes that address wholly separate goals using standards which do not lend themselves to comparison.

made that an individual drinks two liters per day from any significant source of ground water outside the controlled area. A significant source of ground water is defined as any aquifer currently providing the primary source of water for a community water system, or any aquifers that satisfy five technical criteria. These criteria, according to the EPA, identify underground water formations that could meet the needs of community water systems in the future. *See* 50 Fed.Reg. 38,078, col. 3.

While the individual protection requirements thus provide a level of protection, they also tolerate levels of contamination of drinking water sources well in excess of primary drinking water standards established by EPA under the SDWA, thus permitting "endangerment" of such sources as defined in the SDWA. Pursuant to the SDWA, the EPA has established the maximum contaminant level for man-made radionuclides in drinking water. 42 U.S.C. § 300g–1. Accordingly, "drinking water shall not produce an annual dose equivalent to the total body or any internal organ greater than 4 millirem/year." 40 C.F.R. § 141.16(a). With the exception of two specific radionuclides (Tritium and Strontium–90), the concentration of man-made radionuclides causing 4 millirems total body (or organ dose equivalents) is to be calculated on the basis of assuming that the individual will consume two liters of drinking water per day. 40 C.F.R. § 141.16(b).

As set out, *supra*, drinking water supplies are to be considered endangered under the SDWA if the underground injection "*may* result in the presence in underground water which supplies or can reasonably be expected to supply any public water system of any contaminant, and if the presence of such contaminant *may* result in such system's not complying with any national primary drinking water regulation." 42 U.S.C. § 300h(d)(2) (emphasis supplied). Since the maximum contaminant level of four millirems was promulgated as a national primary drinking water regulation under the SDWA, and since the individual protection requirements (promulgated under the NWPA) allow an individual dose of 25 millirems, it follows that the individual protection requirements allow HLW to be disposed of under circumstances that, in time, may result in endangering underground sources of drinking water.

It can be argued that the individual protection requirements do not necessarily endanger ground water resources because the allowable exposure (25 millirems) might result through a pathway that does not include contamination of ground water supplies. There are several possible pathways that the EPA considers when assessing individual exposure. These possible pathways include direct releases to the land surface, releases through a river, releases to an ocean (then to ocean fish which man would ingest). *See* Background Information Document at Chapter 7. It is conceivable that an individual could receive only 2 millirem/year from underground drinking water sources and the remaining 23 millirems from a different pathway. This, theoretically, would not result in ground water contamination in violation of the no endangerment mandate, *i.e.*, ground water would still be under four millirems. However, this scenario is highly unlikely.

In the preface to the HLW rules the EPA concedes that "the geological and geochemical characteristics of appropriate sites tend to concentrate eventual releases of wastes in any ground water that is close to the site." Preamble, 50 Fed.Reg. 38,078. Moreover, the Agency admitted that even with very good engineered controls, radiation may eventually be released in ground water in the immediate vicinity of a repository. 50 Fed.Reg. 38,077, col. 2. The Agency states that "anyone using such contaminated ground water in the future may receive a substantial radiation exposure (*e.g., several rems per year or more*)." 50 Fed.Reg. 38,077, col. 3 (emphasis supplied). Since a rem is equal to 1,000 millirems (a millirem equals one thousandth of a rem), a possible exposure level of several rems per year will equate to several thousand millirems. In view of the EPA's own references to substantial exposure through sources of drinking water, it seems clear that a large proportion of the allowable 25 millirems would reach the indi-

vidual through the drinking water pathway. We note in this regard that the definition of endangerment, found in the SDWA, *see* 42 U.S.C. § 300h(d)(2), does not require actual violations of primary drinking water standards but rather merely that underground injection *may* result in contamination in excess of the maximum contamination levels set forth pursuant to the Safe Drinking Water Act.

Nor is a violation of the no endangerment provision prevented by EPA's assertion, in the preamble to these rules, that the individual protection requirement "in no way limits the future applicability of the Agency's drinking water standards (40 C.F.R. Part 141)—which protect community water supply systems through institutional controls." 50 Fed.Reg. 38,073, col. 2. Once HLW is placed in a repository, the situation may well be irreversible: there may be no feasible way, years later, to arrest ongoing contamination of surrounding water supplies. To be sure, if a community's water supply is contaminated above levels set in the SDWA, authorities may require that it be abandoned and a new source of supply used. But the EPA's duty under the SDWA is to ensure non-endangerment of underground sources of drinking water. 42 U.S.C. § 300h(b)(3)(C). This cannot be done after the fact.

The individual protection requirements may allow endangerment of drinking water supplies in another way. The individual protections apply for 1,000 years, as compared to the general containment requirements, which apply for 10,000 years. Thus, after 1,000 years, exposures to individuals near the repositories are not regulated (other than to the extent that the generally applicable 10,000 year cumulative release limits regulate any releases near the repositories). Apparently the rule allows for virtually unlimited degradation of underground water supplies near the control area after 1,000 years. Thus, after 1,000 years, the no endangerment provision would be violated. Whether this is a permissible deviation is discussed below. We mention it in this section merely as a further way that the current rules may be said to permit endangerment.

We conclude that the individual protection requirements will permit repositories to be built and used for the disposal of HLW which will, judged by the stricter standard of the SDWA, "endanger" drinking water supplies.

(3) Does Noncompliance With SDWA Make The Regulations Contrary To Law Or Arbitrary And Capricious?

We have determined in sections (1) and (2) above that the challenged HLW regulations pertain to underground injection, and that the standards they provide will allow underground sources of drinking water to be "endangered" within the meaning of the SDWA.

We must now ask whether the foregoing conclusions cause the current regulations to be contrary to law or arbitrary and capricious. The EPA asserts that the no endangerment provision of the SDWA applies to the EPA only in its role as administrator under the SDWA. In its different role as regulator of the disposal of high level waste under the NWPA, the Agency argues that it is free to adopt standards different from the ground water standards established under SDWA. EPA also makes other arguments supporting the proposition that the SDWA is irrelevant to our review of the HLW standards. *See infra.*

In analyzing the relation between the SDWA's no endangerment provision and the HLW standards, we divide our discussion into two parts: (A) Non-compliance with the SDWA in the controlled area, and (B) Non-compliance outside the controlled area.

Briefly summarized, our conclusion in respect to (A) is that when enacting the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101–10226 (1982), Congress was aware that the area in immediate proximity to the buried HLW would likely be dedicated as a natural protective barrier, and hence could become contaminated. We read the NWPA as containing, by implication, authority for the EPA to depart from SDWA standards in any "controlled area."

It follows that insofar as the regulations under review permit radiation contamination of ground water located within the controlled area itself, they are not contrary to law nor do we find them to be arbitrary and capricious.

In respect to (B) our conclusion is different. We find no evidence that Congress expected the HLW standards to permit underground sources of drinking water outside the controlled area to be degraded to levels beneath the standards EPA had established under the SDWA. At very least, such permitted degradation, without any accompanying explanation showing a clear need or justification for a different and lower standard than the SDWA prescribes, is arbitrary and capricious.

We now discuss these matters in detail.

## (A) Non-compliance With The SDWA In The Controlled Area

As we have pointed out above, the only protection for ground water *within the controlled area* comes from the special source ground water requirements. These requirements, however, only apply to specially defined Class I ground waters supplying drinking water "for thousands of persons." It is quite likely that the ground water found in the controlled areas of actually selected repositories will not be of this type. Hence in the controlled area there will probably, as a practical matter, be no limits on the radioactive contamination of such ground water as is present. It follows that any ground water within the controlled area which is a source or potential source of drinking water will be subject to "endangerment" within the SDWA.

However, based on our reading of the Nuclear Waste Policy Act and its legislative history, we conclude that Congress did not expect that its prior no endangerment policy, as found in the SDWA, should be applied to ground water found within the controlled area, even assuming such water were a source or potential source of drinking water.

The NWPA sets out the requirements of the EPA's task. The administrator "pursuant to authority under *other provisions of law*, shall, by rule, promulgate generally applicable standards for protection of the *general environment* from *offsite releases* from radioactive material in repositories." 42 U.S.C. § 10141(a). The EPA's duty applies to releases offsite. We read the statute as allowing onsite releases, or at least as acknowledging that some releases onsite are inevitable.

The EPA has explained that the ground water within the controlled area is necessarily part of the geologic mechanism that is going to be used to contain these wastes. This view has some support in the legislative history. That history, unfortunately, provides little discussion of the EPA's duties beyond merely reiterating that the administrator is to promulgate general standards for protection of the general environment. H.R.Rep. No. 491, 97th Cong., 2d Sess. 57, *reprinted in* 1982 U.S.Code Cong. & Admin.News 3792, 3823. However, in its discussion of the Department of Energy's responsibility in selecting a site for a repository, the legislative history reveals that Congress knew that some contamination of ground water in the immediate vicinity of the radioactive material was inevitable. The House Report describes the Secretary of Energy's responsibility to

develop guidelines to be used in selecting sites qualified to merit in-depth study as possible repository sites. The primary feature of the site specifically to be evaluated consists of a rock medium about 1,000 or more feet underground which will of itself provide one of the primary containments of the waste. Some surface or associated geologic features are also important concerns in site selection. The Secretary is required to specify in the guidelines factors which would qualify or disqualify a site from development as a repository, including proximity to natural resources or populations, hydrogeophysics, seismic activity and nuclear defense activities. *The Secretary is required to give priority to sites in rock which tend to slow down transportation of radionuclides by water.*

1982 U.S.Code Cong. & Admin.News at 3816. Since Congress told the Department

**1278**

of Energy to give "priority to sites *in rock which tend to slow down transportation of radionuclides by water,*" it is clear that Congress knew of the inevitability of some contamination of ground water in the immediate area of the stored waste. Had Congress intended that there be no contamination of ground water in the immediate vicinity, it would have required that the DOE select rock formations that would stop the transportation of radionuclides by water, rather than merely giving priority to rock formations that slow down the spread of radionuclides by water.

Further support for the EPA's approach can be found in the EPA's duties under the Act. The EPA's responsibility is *"pursuant to authority under other provisions of law."* 42 U.S.C. § 10141(a). The other "provisions of law" that are referred to are found in the Reorganization Plan No. 3 of 1970, 3 C.F.R. § 1072 (1966–70 compilation), which was the method, within the executive branch, for organizing the newly created EPA in 1970. The reorganization plan transferred to the EPA the

> functions of the Atomic Energy Commission under the Atomic Energy Act of 1954, as amended, administered through its Division of Radiation protection standards, to the extent that such functions of the Commission consist of establishing generally applicable standards for the protection of the general environment from radioactive material. As used herein, standards mean limits of radiation exposures or levels, or concentrations or quantities of radioactive material, in the *general environment outside the boundaries of locations under the control of persons possessing or using radioactive material.*

Reorganization Plan No. 3 of 1970, § 2(a)(6), 3 C.F.R. § 1073. *See Quivira Mining Co. v. EPA,* 728 F.2d 477 (10th Cir.1984) (reorganization plan effectively transferred Atomic Energy Commission's authority to EPA).

This definition of the parameters of the general environment to be protected by EPA further supports the view that Congress intended that the EPA only regulate releases beyond the controlled site. Since

Congress knew that some ground water contamination is unavoidable and since Congress also knew that the EPA was working under this definition of the general environment (*i.e.,* "outside the boundaries of locations under the control of persons possessing or using radioactive material"), it would be irrational and illogical to assume that Congress expected the EPA to set standards that would prohibit or severely limit all releases to the ground water within the controlled area, especially as Congress acknowledged that some releases are inevitable. We have previously said, "[w]e would be loath to construe the [Clean Air] Act as requiring the Administrator to do the impossible." *NRDC v. EPA,* 478 F.2d 875 (1st Cir.1973).

Moreover, if Congress disagreed with this definition of the general environment from the reorganization plan (which defined the duties of the EPA), Congress would not have used the same terminology (*i.e.,* the term "general environment") that was used in the reorganization plan. This view is further bolstered by the language of the NWPA itself, which required the EPA to protect the general environment from *offsite* releases. 42 U.S.C. § 10141(a). Since EPA's duty only applies to protect against *offsite* releases, Congress implicity allowed or at least expected releases *onsite.*

Finally, we note that the SDWA was enacted in 1974. The NWPA was enacted in 1982. As Congress knew that this nuclear waste could not be disposed of underground without some onsite contamination of ground water, and given the existence of the no endangerment policy of the SDWA, we are faced with conflicting statutory mandates. Using familiar statutory interpretation, when there is such a conflict, the most recent and more specific congressional pronouncement will prevail over a prior, more generalized statute. *See* 2A C. Sands, *Sutherland on Statutes and Statutory Construction* § 51.02 (4th ed. 1984). True, "repeals by implication are not favored," *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d

290 (1974); nonetheless, within the controlled area, we think the two statutes are irreconcilable. *Id.* at 550, 94 S.Ct. at 2482 (only permissible reason for finding of repeal by implication is when earlier and later statutes are irreconcilable). Congress ordered that these highly dangerous wastes be placed underground with the intent that the surrounding geologic formations would be the major component of the containment mechanism. Since Congress knew that such underground disposal will inevitably contaminate some ground water, we cannot read the NWPA as intending that any ground water found within the geologic formations, acting as a containment mechanism, must be kept at drinking water quality. We conclude that Congress meant to override SDWA's no endangerment policy for releases onsite, and therefore the no endangerment provision does not apply to potential drinking water sources within the controlled area. This being so, the "endangerment" of these onsite waters is not contrary to law nor, obviously, would it be arbitrary and capricious, given the administrator's reasoned explanation that contamination of this relatively small area is an essential part of his plan for protecting the outside environment.

(B) Non-compliance In The Accessible Environment

Outside the controlled area, we have much greater difficulty with EPA's arguments seeking to justify a standard which permits the radioactive contamination of sources of drinking water at levels higher than the same agency has deemed acceptable for public water supplies under the SDWA. We are told to read possibly conflicting statutes so as to "give effect to each if we can do so while preserving their sense and purpose." *Watt v. Alaska,* 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981).

The EPA asserts that Part C of the SDWA does not impose a substantive no endangerment duty upon the Agency. The EPA asserts that the no endangerment provisions apply solely within the context of the SDWA itself. It asserts that Part C merely required the EPA to make sure that

the states, in implementing their underground injection control programs, did not allow underground injection that would endanger drinking water sources. And so, according to the EPA, Part C imposed no duties which extend beyond its task of establishing minimum requirements for state underground injection control programs.

That reading of Part C of the SDWA seems too narrow. Congress enacted Part C because of concern about the indiscriminate underground disposal of hazardous substances, and the resulting possible loss of drinking water resources. The EPA was directed to see that, wherever necessary, the state had regulatory systems in place that would protect against future endangerment of drinking water supplies by underground injections. While the states were to do the regulating, EPA was to determine the adequacy of their programs and was directed to devise and impose regulations of its own if a state did not adopt a proper program. Congress's clear intent was that the states should, inter alia, "refrain from adopting regulations which *either on their face or as applied* would authorize underground injection which endangers drinking water sources." H.R. Rep. No. 1185, 93d Congress, 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 6454, 6481 (emphasis supplied). This blanket policy applies to federal as well as state agencies. 42 U.S.C. § 300h(b)(1)(D). Part C thus establishes a clear federal policy to avoid endangering drinking water supplies through underground injection. Moreover, EPA itself set the drinking water standard which it thought proper to assure public health and safety.

It would be anomalous if EPA, as administrator of such a program with a statutory responsibility to assure nonendangerment of drinking water supplies, were free, *without examination or explanation,* to adopt regulations in other areas of its jurisdiction which authorize underground injections that violate its own standards. Perhaps if it were scientifically impossible to meet the goals of the NWPA except by reducing the standards for sources of drinking water

near a repository, this would justify a deviation from the SDWA. Or perhaps there are good reasons reconciling the apparent inconsistency between the two standards. But the administrator nowhere states that compliance with SDWA is impossible or inconsistent with the goals of the NWPA, nor does he offer any explanation of why he deems the lesser standard in the HLW rules to be adequate to protect the public although he does not find it adequate under the SDWA. Moreover, the individual protection requirements apply for 1,000 years, and the Administrator does not explain why drinking water supplies will not be protected at levels established by the SDWA beyond the first 1,000 years.

The EPA asserts that absent some type of "consistency" provision, the requirements of Part C of the SDWA do not apply to rules promulgated under the NWPA. "Consistency" provisions have been used to expressly require that rules promulgated by the EPA under one statute be consistent with rules under another statute. *See, e.g.,* Uranium Mill Tailings Radiation Control Act, 42 U.S.C. § 2022(a) (1982) (EPA's environmental standards for control of uranium mill tailings must be consistent, to the maximum extent practicable, with requirements under the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901–6991 (1982)); Resource Conservation and Recovery Act, 42 U.S.C. § 6905(b) (1982) (EPA must integrate regulations, "to maximum extent practicable, with appropriate provisions of the Clean Air Act, the Federal Water Pollution Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, the Safe

Drinking Water Act, the Marine Protection, Research and Sanctuaries Act of 1972 and such other Acts of Congress as grant regulatory authority to the Administrator.").

Since the NWPA has no such explicit "consistency" clause, the EPA denies any duty to harmonize the HLW rules with Part C of the SDWA. The Agency argues that neither the NWPA, the SDWA, nor the Administrative Procedure Act, requires every new regulation to dovetail with every other statute and regulation administered by the Agency. But the SDWA is no mere incidental provision. It reflects a national policy and standard relative to the country's water supplies. Safeguarding such resources and their users is likewise implicit in the EPA's duty under the NWPA to promulgate HLW "standards for the protection of the general environment from offsite releases from radioactive material in repositories." 42 U.S.C. § 10141(a). EPA's national rule under the SDWA specifying maximum permissible levels of contaminants in public drinking supplies presumably reflects the Agency's best thinking as to what the protection of the public requires. It is puzzling, to say the least, when the same agency now endorses a significantly lower standard—and does so entirely without explanation. Either the SDWA standard is much too stringent or the present standard is inadequate. In the absence of a showing by EPA that, for some reason, the standards of the SDWA are inappropriate to its present task, we think it may not cavalierly ignore those standards. We thus find the current standard arbitrary and capricious.[11]

11. Since the EPA's unexplained issuance of a standard allowing radioactive contamination of drinking water at levels which violate SDWA limits is arbitrary and capricious, requiring remand, we need not decide if this same inconsistency causes the HLW regulation to be "not in accordance with law." 5 U.S.C. § 706(2)(A).

The argument that it is illegal depends on the breadth of the EPA's duty under Part C of the SDWA to prevent nonendangerment of underground drinking water sources. The EPA insists the duty there referred to is limited to its administrative responsibilities *under the SDWA.*

We also note that until a repository site is selected and designed, it remains speculative whether actual endangerment of water will oc-

cur: the protection provided by the engineered barriers and geologic formations might exceed the HLW standards. Indeed, since both the President and Congress have considerable control over the choice of site and design of the facility, higher standards may be required, as a matter of administrative choice. The HLW standards do not *require* that only minimal norms be observed.

While it is thus arguable that these regulations do not necessarily violate the law, we think it clear for reasons stated above that issuance, without explanation, of a conflicting standard in this critical area is, at very least, arbitrary and capricious. It leaves the executive branch and the public without guidance as to

The EPA argues that there will be no violation of the SDWA, relying on its statement in the preamble to the HLW rules that they in no way limit "the future applicability of the Agency's drinking water standards (40 C.F.R. Part 141)—which protect community water supply ' systems through institutional controls." 50 Fed. Reg. 38,073, col. 2 (Sept. 19, 1985). The Agency nowhere claims, however, that HLW must be disposed of so that radiation levels will meet SDWA's underground injection rules rather than only the more liberal individual protection standard. Applicability of 40 C.F.R. Part 141 means merely that community water systems must be monitored and treated, as necessary, to ensure that radionuclide concentrations do not exceed the levels allowed under the drinking water standards. *See* 40 C.F.R. §§ 141–143 (1985). Thus the Agency's reliance on the future applicability of these rules means, in effect, that the responsibility and burden of cleaning up the excessive radiation releases to drinking water resources will fall on the local water companies. While placing this burden on the local water companies may prevent this contaminated water from being improperly used as drinking water, it will not prevent the future *endangerment* of drinking water supplies, which is a declared purpose of the Safe Drinking Water Act.

We cannot accept the Agency's claim that it may close its eyes to the possible and very likely future violations of the SDWA that will result from these design criteria, while blithely asserting that in the future the SDWA's regulations will still apply so as to protect drinking water. Enforcing the SDWA sometime in the future might well be too late since Congress's intent in enacting Part C of the SDWA was to *prevent* the endangerment of drinking water sources and thus ensure that there will be sufficient quantities of usable groundwater for future generations. Once those drinking water resources are contaminated, the other regulations under the SDWA may guard against improper use of this water for drinking, but the SDWA will

not restore the drinking water sources to their original quality.

The simple fact is that disposal of HLW in the manner here contemplated will very likely amount to an "underground injection." In announcing criteria which, until far in the future, the planned injection must be presently designed to satisfy, the EPA was irrational to establish, without a word of explanation, different and more relaxed criteria than the EPA's co-existing SDWA standard applicable to all other underground injections. By so doing, DOE and other agencies responsible for site selection and design are left in a quandary as to their possible separate responsibilities under the SDWA, since it is known that underground water will likely be encountered and that future contamination is a serious possibility. To be rational, the HLW regulations either should have been consistent with the SDWA standard—thus requiring repositories to be designed so that future emissions into any sources of drinking water will not result in contamination exceeding SDWA standards—or else should have explained that a different standard was adopted and justify such adoption. As matters now stand, the DOE may be encouraged to expend large sums on site selection, design and construction only to discover itself embroiled in a dispute as to whether the EPA's HLW standards excuse it from securing a state underground injection permit based on the EPA's different, more stringent standards. These are matters the EPA, relying on its expertise, should face and clarify in the HLW regulations; otherwise the HLW regulations will be on a collision course with the SDWA regulations. It is irrational for the EPA, as administrator of both sets of regulations, to ignore the inevitable clash. Rationally, this is the time for the Agency to determine and express its position, since all concerned are entitled to know whether the EPA believes that repositories must meet the SDWA's underground injection control rules as well as the individual protection standards and, if not, the rationale upon

which standard must be observed to assure a proper measure of environmental safety.

which a lesser standard is deemed sufficiently safe.

We emphasize that we are not holding that the Agency is necessarily incorrect in promulgating the present standard. We do not possess the necessary expertise to judge whether there are grounds for a lesser standard than that under the SDWA. *See South Terminal Corp.*, 504 F.2d at 665; *Duquesne Light Co. v. EPA*, 522 F.2d 1186, 1196 (3d Cir.1975). As we are not scientists, we recognize that there could be valid explanations, not occurring to us, which would support a finding that these standards are rational. However, the Agency has never even acknowledged the interrelationship of the two statutes in respect to the Part C underground injection rules, and it has presented no reasoned explanation for the divergence between the level of contamination allowed by the HLW rules and the permissible levels of radiation contamination under the SDWA. *Motor Vehicle Manufacturers Association v. State Farm Mutual Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (agency decision to rescind rule arbitrary and capricious because agency failed to consider relevant issue and failed to give sufficient explanation for decision); *Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade*, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) (agency's decision to allow rate change remanded because agency failed to set forth clearly the grounds on which it acted).

We hold that, for this reason, the present HLW rules are, on their face, arbitrary and capricious and hence invalid. They must be returned to the Agency for further consideration, which will result in either a new rule or, if the present standard is retained, an explanation of the present apparent inconsistency and irrationality.

## V. PROCEDURAL CHALLENGE TO THE GROUND WATER PROTECTION REQUIREMENTS

Texas complains that in promulgating the ground water protection requirements, 40 C.F.R. § 191.16, the EPA failed to provide adequate notice and opportunity for comment as required by the Administrative Procedure Act, 5 U.S.C. § 553(b), (c). Texas especially attacks the definition of "special source of ground water," 40 C.F.R. § 191.12(*o*), which delineates the class of ground water that is covered by the ground water protection requirements (*i.e.*, Class I ground waters that also meet three additional criteria, *see supra*). Texas's primary complaint is that the definition of special source of ground water is so narrowly drawn that most of the nation's usable ground water is not protected.[12] Texas asserts that if it had been given notice that ground water protections were being considered, and especially if it had been given notice that such a narrow class of water was going to be protected, it would have commented and pointed out its perceived problems with the rule.

The HLW rules when initially proposed included only (1) Subpart A, which governed management and storage (prior to disposal) and which set exposure limits for individuals at 25 millirems to the whole body; 75 millirems to the thyroid, 25 millirems to any other organ (this portion of the rule had some minor changes in the final rule); (2) the general containment require-

---

12. This attack really goes beyond a challenge to this particular, very narrow rule, and challenges the HLW standards' overall approach to ground water protection. As we have pointed out, the principal offsite ground water protection in EPA's present scheme comes from the individual protection requirements, which include the requirement that it be assumed that individuals consume two liters a day from any significant source of ground water outside the controlled area. In the previous section of this opinion, we have found that the 25/75 millirems standard there adopted was arbitrary and capricious since it is significantly more liberal than the

SDWA standard. The special source ground water requirement is the only part of the HLW rule that utilizes the stricter SDWA standard—yet it applies only to a very specialized and limited class of water at the controlled area, the one place where Congress seems clearly to have envisaged allowing radiation contamination.

The present procedural attack on the special source ground water requirement thus implicates not just the procedural validity of that rule but, more generally, the procedural validity of the entire HLW rule insofar as it may or may not afford an adequate level of protection to ground water and drinking water.

ments, which were modified in the final rule; (3) the assurance requirements, which were also modified in the final rule. *See* Proposed Rule, 47 Fed.Reg. 58,204 (Dec. 29, 1982). The individual and ground water protection standards were not part of the proposed rule, but were added to the final rule. The Agency argues that the latter two provisions were added in response to comments received during the comment period, and that the final rule is a logical outgrowth of the notice and comments received.

■ A final rule which contains changes from the proposed rule need not always go through a second notice and comment period. An agency can make even substantial changes from the proposed version, as long as the final changes are "in character with the original scheme" and "a logical outgrowth" of the notice and comment. *South Terminal Corp. v. EPA*, 504 F.2d 646, 658 (1st Cir.1974); *BASF Wyandotte Corp. v. Costle*, 598 F.2d 637, 642 (1st Cir.1979), *cert. denied*, 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980).

> The essential inquiry is whether the commenters have had a fair opportunity to present their views on the contents of the final plan. We must be satisfied, in other words, that given a new opportunity to comment, commenters would not have their first occasion to offer new and different criticisms which the Agency might find convincing. Thus, where the final rules "are a result of a complex mix of controversial and uncommented upon data and calculations," remand may be in order. *Similarly, where the Agency adds a new pollution control parameter without giving notice of intention to do so or receiving comments, there must be a remand to allow public comment.* The question, however, always requires careful consideration on a case-by-case basis.

*BASF Wyandotte*, 598 F.2d at 642 (emphasis added).

Here, although the proposed rule did not contain either the individual protection requirements or the ground water protection requirements, in the preamble to the proposed rule the Agency expressed its concern that perhaps protections for individuals were necessary, explaining that,

> We particularly seek comment on a different approach to our standards for disposal—an alternative that would establish radiation exposure limits for individuals, such as the limit of 25 millirems per year in Subpart A of this proposal, rather than the radionuclide release limits that we are proposing.
>
> Standards based on individual exposure limits, or equivalent standards which limit radionuclide concentrations in air or water, restrict the risks that any particular individual may be exposed to. [The Agency went on to explain why it thought that an approach based upon individual dose limits would not be appropriate.] Thus, we believe our proposed approach will facilitate licensing of good disposal systems while providing appropriate environmental protection from the long term risks presented by high-level wastes. However, the arguments favoring individual exposure limits are also persuasive, and we particularly seek comments on which approach we should ultimately select.

*See* Preamble to Proposed Rules, 47 Fed. Reg. 58,203, col. 2 (Dec. 29, 1982).

The public comment period for the proposed rule lasted until May 2, 1983. Also in May of 1983, the EPA held public hearings in Washington, D.C. and Denver, Colorado. As a result of the hearings, the Agency identified several issues upon which it felt additional comments were needed. The Agency opened a new round of notice and comment on these issues which lasted until June 20, 1983. *See* Request for Post-Hearing Comments, 48 Fed. Reg. 23,666 (May 26, 1983). The EPA also sent a letter, which identified the same issues for comment, to everyone that had originally commented on the proposed rules.

One of the issues highlighted for comment specifically addressed the question of an individual protection requirement and it alluded to the possibility that an individual dose limit might include ground water lim-

its.[13] However, the issues highlighted for review did not mention that an additional and separate ground water rule was contemplated.

Also during 1983, a subcommittee of the Science Advisory Board ("SAB")[14] conducted a scientific review of the proposed rule. The SAB subcommittee's final report was submitted to the EPA in February 1984. The subcommittee's report recommended that the definition of accessible environment be extended to include major sources of potable ground water beyond the controlled area (the original definition of accessible environment did not expressly include all ground water beyond the controlled area). However, there was no recommendation that a separate ground water protection limit be set, or that the Agency should place direct release limits on ground water. Since the Agency anticipated that many of the subcommittee's recommendations would be incorporated into the final rule, the EPA also sought public comment on the SAB subcommittee's report. *See* 49 Fed.Reg. 19,604 (May 29, 1984).

 We believe that the Agency gave reasonably clear notice that individual protection requirements were being considered since it expressly invited comments on the question of whether an individual exposure limit was appropriate. Moreover, in seeking such comment, the Agency drew the public's attention to the 25/75 millirem individual exposure limit that was part of the proposed management and storage rule of Subpart A. Thus the public was reasonably on notice of the expected form that

such a new rule might take. *See* 5 U.S.C. § 553(b)(3) (notice in the Federal Register shall include either "the terms or substance of the proposed rule or a description of the subjects and issues involved"). However, we are not convinced that the Agency gave sufficient notice concerning any requirements that might be tied specifically into the protection of ground water.[15] We stated in *BASF Wyandotte*,

> The essential inquiry is whether the commenters have had a fair opportunity to present their views on the contents of the final plan. We must be satisfied, in other words, that given a new opportunity to comment, commenters would not have their first occasion to offer new and different criticisms which the Agency might find convincing.

*BASF Wyandotte*, 598 F.2d at 642.

Here, since the concept of a separate rule setting limits on ground water was never presented to the public, nor were the final ground water protection requirements ever opened for public comment, we are convinced that given a new opportunity to comment, commenters would "have their first occasion to offer new and different criticisms which the Agency might find convincing." *Id.* This conclusion is bolstered by reviewing the definition of special source ground water itself. The linchpin of the definition is the designation of Class I ground water, as defined in the EPA's Ground-Water Protection Strategy, and yet the Ground-Water Protection Strategy was not even published until August

---

**13.** The questions highlighted for comment on this issue included: Should we include a limit on individual exposure in our standards for disposal, considering the arguments that have been offered in the comments on our proposed rule?; If so, should it apply to someone who might attempt to use ground water in the vicinity of a disposal site sometime in the future?; Should it apply only for ground water at some distance from the repository—like the distances considered in the potential definitions of the "accessible environment"—or should it apply to any ground water source?; Would it be adequate to add a qualitative requirement that individual doses should be kept as low as reasonable?; Would it be adequate to explicitly rely upon other existing individual dose limitations—such as EPA's drinking water standards

or NRC's 10 C.F.R. Part 20—for protection regarding ground water that might be contaminated in the future by disposal systems?

**14.** The Science Advisory Board is an independent consultative body established under the Environmental Research, Development and Demonstration Authorization Act of 1978, 42 U.S.C. § 4365, to "provide such scientific advice as may be requested by the administrator."

**15.** As we have already remanded the individual protection requirements to the Agency for further study, we need not consider whether a second round of notice and comment was required in respect to the part of these requirements that indirectly protects ground water.

1984, which was at least one month after the official public notice period ended in June 1984.[16] The public was never able to comment on the appropriateness of using this Class I designation as a definition of what ground water would be protected since the term "Class I" had never been coined until after the official public comment period had closed. Nor was the public able to comment on the additional criteria which further reduced the amount of Class I ground water that would be protected. Given the initial lack of sufficient notice that a separate ground water protection rule was being considered, it was clearly impossible for the public to offer useful comment as to the scope of protection that the new rule should provide. *See Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C.Cir.1983) ("Agency notice must describe the range of alternatives being considered with reasonable specificity. Otherwise, interested parties will not know what to comment on, and notice will not lead to better-informed agency decisionmaking.").

It seems significant that the majority of the complaints presented to this court concerning the HLW rules relate to the ground water protection requirements. The various petitioners attack the special source ground water definition as being far too underinclusive; as being too vague; or as being useless in that the rule does not really protect any ground water that is likely to be contaminated. Because the public never saw this provision until the final rule was promulgated,[17] it is not surprising that the petitioners are now raising so many challenges to this provision since this court provides the first and only forum that they have had in which to express their concerns. Had the EPA opened a new comment period when they promulgated this never before proposed or foreshadowed rule, a significant number of the complaints that are before us now could have been resolved by the Agency either by amending the rule or by adequately explaining why the commenters' suggestions were not adopted.[18] *See National Tour Brokers Association v. United States*, 591 F.2d 896, 902 (D.C.Cir.1978) (purpose of notice and comment rulemaking is both to allow the agency to benefit from the experience and input of the parties who file comments and to make sure that the agency maintains a flexible and open-minded attitude toward its own rules); *Chocolate Manufacturers Association of the United States v. Block*, 755 F.2d 1098 (4th Cir.

16. The Federal Register notices each established a specific deadline for submission of written comments. Apparently the Agency continued to review public comments received after the deadlines. *See* Background Information Document at 1–1. However, there is no evidence of public notice to the effect that the Agency was willing to receive additional comments, and so no member of the public was expressly on notice that they could continue to comment on the newly published Ground-Water Protection Strategy.

17. According to Texas a definition of special source of ground water (which differed from that finally adopted) first appeared in a document entitled Working Draft No. 5, dated March 21, 1985. Apparently each page was marked "FOR REVIEW WITHIN EPA AND OTHER FEDERAL AGENCIES." Nevertheless, the working drafts were filed in the rulemaking docket located in Washington, D.C.; however, there was no notice of availability placed in the Federal Register. Thus, apparently an interested member of the public could travel to Washington to review the docket to see what the Agency was considering. Since this working draft was dated well after the official published deadline for comments, *see* note 16, *supra*, adequate notice cannot be inferred from the working draft. It is unreasonable to expect the public periodically to check the administrative docket, located in Washington, long after the comment period deadlines have passed.

18. After the official comment period, the state of Texas sent a letter to the EPA, with a new suggestion that there should be a separate ground water protection rule (at that time there was no indication that the EPA was considering a separate ground water rule). Texas wanted a zero based release limit, *i.e.*, no detectable release of radiation, and Texas suggested that all ground water that is or might be used for agricultural purposes be protected by the rule. Apparently, the EPA accepted some of Texas's suggestion by instituting a separate ground water rule; however, the new rule has little resemblance to Texas's suggested rule. Inexplicably, in the Response to Comments document, the EPA does not discuss the Texas suggestion nor does it explain why the EPA decided not to specifically protect ground water used for agricultural purposes.

1985) (public participation in rulemaking ensures informed agency decisionmaking).

We note that in order for a rule to be upheld against a substantive challenge (as opposed to a procedural challenge) the Agency must give an adequate explanation of why the rule was promulgated in its final form.[19] The EPA's explanation of why only certain Class I ground waters were protected by the ground water protection requirements is not very helpful. The EPA merely states that "the Agency believes these provisions are necessary and adequate to avoid any significant degradation of the important drinking water resources provided by these Class I ground waters." 50 Fed.Reg. 38,074, col. 1. This statement does not explain why all Class I ground waters were not protected or why the Agency chose the limiting criteria that cut back the type of Class I ground water that the rule protects. Nor does this explanation point to any evidence in the administrative record which supports this bald assertion. Because the petitioners never had a comment period in which to express their concerns, of course the Agency's explanation is going to be vague and cannot address petitioners' complaints.

We realize that in promulgating the HLW rules the Agency was faced with a difficult task, and that the Agency was working under severe time restraints.[20] However, we believe that in this case, where the issues are so complex, the Agency must be careful to give full and adequate public notice. As has been pointed out before, since a reviewing court normally gives deference to the Agency's substantive conclusions in complex regulatory matters, we will insist that the required procedures be strictly complied with. *BASF Wyandotte Corp. v. Costle*, 598 F.2d at 641; *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1027–28 (D.C.Cir.1978).

We must therefore remand the ground water protection requirements for a second round of notice and comment.

## VI. OTHER CHALLENGES

Petitioners assert a number of additional challenges to the HLW rules, many of which relate to the ground water protection requirements. Since we are remanding the ground water standard for further notice and comment, we will not address the claims that directly challenge that standard.

### (1) The Individual Protection Requirements' 1,000 Year Design Criterion

Petitioners, NRDC, et al., attack as arbitrary and capricious the EPA's decision to limit the duration of the individual protection requirements to 1,000 years. Their argument is different from the one discussed above that the 1,000 year time frame allows for a violation of the SDWA after the first 1,000 years. Here they argue that the 1,000 year time frame is simply unsupported and arbitrary. We believe this argument has merit and therefore remand this aspect of the individual protection requirements to the Administrator.

EPA originally decided to base its regulatory approach on population risk criteria and, toward this goal, adopted the general containment requirements of 40 C.F.R. § 191.13. *See* 47 Fed.Reg. 58,198–58,200 (Dec. 29, 1982). In response to comments, however, the Agency came to believe that reduction of population risk alone was insufficient and that there were "important advantages in providing for individual protection in ways compatible with the containment and assurance requirements." 50 Fed.Reg. 38,073 (Sept. 19, 1985). The inadequacy of relying on the containment regulations alone to protect certain individuals

---

**19.** Reviewing courts will not rely on appellate counsel's post hoc rationalizations in lieu of adequate findings or explanations from the agency itself. *NRDC, Project on Clean Air*, 478 F.2d at 881.

**20.** The NWPA required the EPA to promulgate these standards no later than January 7, 1984. When the standards were not promulgated a year after that deadline, the NRDC, Environmental Policy Institute, and others sued the EPA over its failure to comply with the statutory deadline. A consent order was agreed to by the parties mandating issuance of the standards by August 15, 1985. The final standards were published in September 1985.

from significant doses is best described in the Agency's own words:

> The Agency believes that the containment requirements in § 191.13 will insure that the overall population risks to future generations from disposal of these wastes will be acceptably small. However, the situation with regard to potential individual doses is more complicated. Even with good engineering controls, some waste may eventually (i.e., several hundreds or thousands of years after disposal) be released into any ground water that might be in the immediate vicinity of a geologic repository. Since ground water generally provides relatively little dilution, anyone using such contaminated ground water in the future may receive a substantial radiation exposure (e.g., several rems per year or more). This possibility is inherent in collecting a very large amount of radioactivity in a small area.

50 Fed.Reg. 38,077, col. 3 (Sept. 19, 1985). Moreover, even though the Agency's Science Advisory Board advocated retention of the population risk criteria as the primary measure of performance for the proposed standards, it also supported the formulation of special protections for individuals near repository sites. SAB Subcommittee Report at 4–5.

EPA's original proposed regulations had relied solely on certain of the assurance requirements in section 191.14—including the requirement that both natural and engineered barriers be employed at any repository site—to reduce the likelihood of long-term, damaging exposure to individuals. Public comments on the original proposed rules, however, convinced the Agency that *numerical restrictions* on potential individual doses were needed in the revised regulations. *See* 50 Fed.Reg. 38,078 (Sept. 19, 1985). Rather than completely replace the containment requirements with individual dose limitations, EPA sought in the revised rules to achieve a mix of regulatory mechanisms by *adding* a layer of specific protections for individuals that would be consistent with, yet remedy the shortcomings of, the containment requirements. To achieve this end, the Agency promulgated regulations requiring that disposal systems be designed to provide a reasonable expectation that, *for the first 1,000 years* after disposal, individuals will not absorb an annual dose of radiation in excess of 25 millirems to the whole body (or 75 millirems to any critical organ). 40 C.F.R. § 191.15.

EPA cites at least two specific reasons for refusing to extend the duration of the individual protections further into the future than the first 1,000 years after disposal. First, it states that 1,000 years is "long enough to insure that particularly good engineered barriers would need to be used at some potential sites where some ground water would be expected to flow through a mined geologic repository." 50 Fed.Reg. 38,073, col. 1 (Sept. 19, 1985). Second, the Agency asserts that

> demonstrating compliance with individual exposure limits for times much longer than 1,000 years appears to be quite difficult because of the analytical uncertainties involved. It would require predicting radionuclide concentrations—even from releases of tiny portions of the waste—in all the possible ground water pathways flowing in all directions from the disposal system, at all depths down to 2,500 feet, as a function of time over many thousands of years. At some of the sites being considered (and possibly all of them, depending upon what is discovered during site characterization) the only certain way to comply with such requirements for periods on the order of 10,000 years appears to be to use very expensive engineered barriers that would rule out any potential release over most of this period. While such barriers could provide longer-term protection for individuals, they would not provide substantial benefits to populations because the containment and assurance requirements already reduce population risks to very small levels.

*See* 50 Fed.Reg. 38,073, cols. 1–2 (Sept. 19, 1985). Furthermore, in another portion of its discussion of the new regulations, EPA explains that adopting individual protection regulations of longer duration "could substantially delay development of disposal

systems without providing significantly more protection to populations," 50 Fed. Reg. 38,078, col. 2 (Sept. 19, 1985), and that it "consider[ed] ... this information" in crafting the individual protections contained in section 191.15.

Petitioners challenge EPA's choice of a 1,000 year duration on several grounds, arguing that the 1,000 year limitation is arbitrary and capricious, amounts to an error of judgment, and is not supported by evidence in the administrative record. Petitioners are troubled by the fact that EPA's choice of the 1,000 year period ensures that the new numerical standards will not apply at the precise moment in time when EPA expects significant contamination of the accessible environment to begin to occur. On a more concrete level, petitioners contend that the Agency impermissibly considered population risk in setting the time limit, wrongly considered the likelihood of delay in the construction of a disposal system, and concluded, without record support, that a duration longer than 1,000 years would lead to prohibitive costs and difficulties in demonstrating compliance with the standards.

We are not persuaded that the Agency's action amounted to a clear error of judgment, but we do agree with petitioners' complaint concerning EPA's apparently exclusive reliance on considerations of population risk in explaining its reasons for limiting the duration of the individual protections to 1,000 years. The Agency's principal response to this charge is that the Administrator's decisionmaking was not driven by considerations of either *population risk* or *individual risk* to the exclusion of the other. Instead, his objective was to combine the two types of protection in an effort to obtain a comprehensive regulatory scheme with the proper mix of both approaches. We would be willing to accept this rationalization as a proper exercise of the Agency's expertise in arriving at such complex policy judgments if, indeed, the administrative record demonstrated that individual risk assessment had played some part in the calculation of the durational limit in section 191.15. Our review of the record, however, does not support this con-

clusion. Although the concept of individual risk assessment was noted, the explanation offered by the Agency reflects an analysis made solely in terms of population risk.

As we have noted, EPA has determined that the containment requirements contained in section 191.13 (which are designed to reduce population risk) are an inadequate means of controlling risk to certain individuals and that individuals located in the vicinity of potential repository sites could be at extreme risk of receiving substantial doses of radiation after several hundred or thousand years, even if "good" engineered barriers are utilized. EPA also recognizes that individual risk could be significantly reduced if the duration of the protections contained in section 191.15 were increased. Such an increase in the duration of the individual dose limitations would apparently call for either more stringent siting criteria (for example, use of sites featuring a salt medium that appear capable of protecting individuals from significant exposure for 10,000 years even *without* the use of engineered barriers), *see, e.g.,* Final Regulatory Impact Analysis at 55, or for better canisters that could assure compliance with the longer duration of the standards (such as the "very good canisters," crafted from copper, that EPA admits could ensure compliance with the individual protection standards for 10,000 years even at a basalt repository site), *see id.* at 56–59. Yet the Agency's reasons for limiting the duration of the individual protections to 1,000 years curiously turn only on an assessment of how a longer duration would affect *population* risk. The Agency does not mention the concomitant reduction in *individual* risk (which revised section 191.15 was designed to address), nor does it even purport to weigh these competing goals in light of the increased costs and complications expected to accompany the adoption of a design criterion in excess of 1,000 years.

As petitioners point out, EPA's primary reason for not choosing a longer period is that there would be difficulties "demonstrating compliance with individual exposure limits for times much longer than

1,000 years." 50 Fed.Reg. 38,073, col. 2 (Sept. 19, 1985). EPA admits, however, that better engineered barriers could ensure almost certain compliance at all potential sites for times on the order of 10,000 years. *Id.* It rejects this option only because, although "such barriers could provide longer-term protection for individuals, they *would not provide substantial benefits to populations." Id.* (emphasis supplied). We find this explanation to be deficient because it purports to justify the Agency's policy choice solely in terms of a variable that the individual protections were not designed to influence. There must be some additional explanation concerning why the enhanced individual protection that could be achieved is outweighed by other factors.

Likewise, EPA's Final Regulatory Impact Analysis of 40 C.F.R. Part 191 demonstrates that more rigorous site selection could produce sites with such impermeable geologic media that compliance with the individual protections for a much longer duration would not even require the extra cost of "very good" engineered canisters. *See* Final Regulatory Impact Analysis at 55–56. EPA's only apparent reason for rejecting this option is that, "[a]lthough it might be possible to find certain geologic settings that avoid [the problem of substantial releases of radiation into groundwater after 1,000 years], such restrictive siting prerequisites could substantially delay development of disposal systems *without providing significantly more protection to populations."* 50 Fed.Reg. 38,078, col. 2 (Sept. 19, 1985) (emphasis supplied). Again in this portion of its justification, it does not appear that the Agency has permitted *individual* risk assessment to enter into its cost-benefit calculus.

EPA's only affirmative reason for choosing a duration of at least 1,000 years for section 191.15 is that "the Agency's assessments indicate it is long enough to insure that particularly good engineered barriers would need to be used at potential sites where some ground water would be expected to flow through a mined geologic repository." 50 Fed.Reg. 38,073, col. 1 (Sept. 19, 1985). This rationale, however, simply begs the question. The record contains no sufficient explanation of why the Agency opted to draft section 191.15 in a manner that would require only "particularly good engineered barriers." Without appropriate justification for this policy choice, we hesitate to defer to the Agency's expertise even in this scientifically complex area.

We admit to being disturbed by the fact that the addition of individual protections with explicit numerical dose limitations will apparently have no practical effect on the Department of Energy's siting determinations or on the choice of what quality engineered barriers should be used at a given repository:

> [T]he Agency believes that there need not be any significant additional costs to the national program for disposal of commercial wastes caused by retaining the proposed level of protection in the final rule, compared to the costs of choosing levels considerably less stringent. In other words, *all of the disposal sites being evaluated by the Department [of Energy], assuming compliance with the existing requirements of 10 C.F.R. Part 60, are expected to be able to meet these disposal standards without additional precautions beyond those planned.*

50 Fed.Reg. 38,084, col. 1 (Sept. 19, 1985) (emphasis supplied). This admission by the Agency that the individual protections, as drafted, will have little, if any, impact strengthens our conviction that the Agency has not provided an adequate explanation for selecting a 1,000 year design criterion. Thus, for all of the reasons stated, we hold that the 1,000 year design criterion of section 191.15 is arbitrary and capricious on the administrative record before us. In so holding, we are not concluding that the choice of a 1,000 year duration is inherently flawed, but only that the record and the Agency's explications as they now stand do not sufficiently support the Agency's choice. We remand this portion of the HLW regulations to the Agency for reconsideration of the 1,000 year design criterion or, at the very least, a more thorough explanation of the reasons underlying the choice of 1,000 years.

**(2) The Variance Provision Of Subpart A**

Minnesota challenges the Subpart A variance provision. Subpart A sets annual exposure limits to individuals from the predisposal management and storage of HLW. The rule includes a variance mechanism which allows the EPA to issue alternative standards for facilities not regulated by the NRC (*i.e.*, DOE military-related facilities) if upon review of an application the administrator determines that certain set annual exposures will not be exceeded and if

The Administrator promptly makes a matter of public record the degree to which continued operation of the facility is expected to result in levels in excess of the standards specified in 191.02(b) [the normal annual exposure limits].

*See* 40 C.F.R. § 191.04. The variance provision also requires that an application for such alternative standards be submitted as soon as possible after the DOE determines that a facility's continued operation will result in excessive releases of radiation. *Id.*

Minnesota argues that this variance provision is vague and provides the EPA with overly broad discretion. Minnesota asserts that this variance mechanism will allow the Agency to permanently modify the standards, and that the DOE would have no obligation to comply with the current standards. Therefore, Minnesota argues the variance mechanism will not serve to protect the public health and environment.

■ We do not accept this contention. The DOE is required to comply with the standards at the current exposure levels since nothing in the variance procedure allows the DOE to ignore these limits. Should the DOE feel it needs a variance, it must go though the alternative standards procedure. Thus we do not find that this provision fails to protect the public health.

■ As to the possibly permanent nature of such a variance and the allegedly overly broad discretion given the EPA, we note that the Agency must notify the public concerning the variance. EPA's counsel represented at oral argument that Federal Register notice and judicial review would be available for any alternative standards. Thus the reasonableness of any such variance in terms of either length of time (*i.e.*, permanent or temporary) or allowable exposure limits will be subject to judicial review. *See American Mining Congress v. Thomas*, 772 F.2d 617, 639 (10th Cir.1985) (upholding an alternative compliance exception to regulations under the Uranium Mill Tailings Radiation Control Act, since judicial review was available to test the reasonableness of granted exceptions), *cert. denied*, — U.S. —, 106 S.Ct. 2276, 90 L.Ed.2d 718 (1986).

**(3) The Assurance Requirements**

Minnesota also attacks the EPA's decision that the assurance requirements, 40 C.F.R. § 191.14, will be applicable only to disposal facilities that are not regulated by the NRC. Minnesota asserts that this creates a "loophole" that the NRC could use to avoid compliance with the assurance requirements.

When the HLW rules were first proposed, the assurance requirements applied to all facilities, including those regulated by the NRC. In its comments on the proposal, the NRC argued that such qualitative assurance requirements, which are designed to ensure that the numerical containment requirements are met, are beyond EPA's statutory authority. The NRC argued that the EPA's authority only extended to setting generally applicable environmental standards. The NRC viewed the assurance requirements as a compliance mechanism which interferes with its responsibility, as the licensing agency, to ensure compliance. Thus the NRC argued that the EPA was exceeding its authority and that this compliance mechanism was within the NRC's authority.

EPA felt that the assurance requirements were an appropriate part of the environmental standards because they are necessary to establish the regulatory context for the quantitative containment requirements. However, in order to avoid delay in promulgating the standards, the agencies decided to resolve the jurisdictional dispute by having the NRC modify its regulations

to incorporate, where necessary, the intent of the assurance requirements. The NRC has proposed additions to its rules so as to incorporate the substance of the EPA's assurance requirements. *See* Notice of Proposed Rulemaking, 51 Fed.Reg. 22,299 (June 19, 1986). The EPA intends to participate in the NRC's rulemaking in order to ensure that the intent of all the assurance requirements are embodied in federal regulations. *See* 50 Fed.Reg. 38,072, col. 3. Moreover, EPA intends to amend its regulations if the NRC's amendments prove unsatisfactory. "[T]he Agency will review the record and outcome of the Part 60 rulemaking [the NRC rules] to determine if any modifications to 40 C.F.R. Part 191 [the EPA rules] are needed." 50 Fed.Reg. 38,072, col. 3.

■ Since the Agency intends to make certain that the assurance requirements are included in the federal regulations either by NRC's promulgation, or, if necessary, by amendments to its own regulations, we find that this is a reasonable method of settling the interagency jurisdictional dispute. Under the NWPA, the NRC is required to ensure that its licensing decisions are consistent with the EPA-promulgated standards, 42 U.S.C. § 10141(b)(1)(C), and if the EPA changes its standards, the NRC must accordingly amend its licensing standards, 42 U.S.C. § 10141(b)(2). Thus, it is the NRC's licensing decisions which will be the actual vehicle for implementing the EPA's standards. We see little substantive difference between having the NRC enforce compliance with the assurance requirements, as articulated under EPA's part of the federal regulations (40 C.F.R. Part 160), or having the NRC enforce compliance of the assurance requirements which have been incorporated into its own rules (10 C.F.R. Part 60), so long as the full intent of the assurance requirements are embodied in either section.

Minnesota further challenges the assurance requirements themselves, arguing that the EPA was arbitrary and capricious in its decision to delete one of the originally proposed assurance requirements. The originally proposed standards contained an assurance requirement that

Disposal systems shall be selected and designed to keep releases to the accessible environment as small as reasonably achievable, taking into account technical, social and economic considerations.

*See* 47 Fed.Reg. 58,205 (Dec. 29, 1982).

In the final rule, EPA decided to delete this assurance requirement finding it unnecessary because two aspects of related rules that were subsequently promulgated by NRC and DOE embodied the same concept. 50 Fed.Reg. 38,072, col. 2. The NRC adopted a multiple barrier principle which required very good performance from two types of engineered barriers: a 300 to 1,000 year lifetime for waste containers during which there would be essentially no waste releases; and a long-term waste release rate of no more than one part in 100,000 per year. EPA asserts that this requirement by NRC represents the "best performance reasonably achievable for currently forseeable engineered components." *Id.*

DOE promulgated a provision in its site selection rules that requires significant emphasis be placed on selecting sites that demonstrate the lowest release of radiation over 100,000 years compared to alternative possible sites. EPA believes that this provision ensures adequate encouragement to choose sites that provide the best available isolation capabilities. 50 Fed.Reg. 38,072, col. 2.

■ Since EPA felt that these two provisions already codified the intent of the proposed assurance requirement, to keep long-term releases as small as reasonably achievable, the EPA deleted as no longer necessary the proposed assurance requirement. Minnesota argues that the NRC rule merely focuses on reasonably achievable *technology* rather than minimizing potential *releases*, which was the intent of the proposed assurance requirement. We believe it is well within the EPA's expertise to determine that a rule regulating *technology* will accomplish the desired limit on *releases*.

Minnesota further argues that the DOE's rule merely requires DOE to compare releases and does not require DOE to select sites which have the lowest releases. EPA responds that there is nothing in the originally proposed qualitative assurance requirement that would absolutely require the selection of one site over another, especially since the proposed regulation required that technological, social and economic considerations should be factored into the goal of selecting disposal systems that minimize releases.

 As the EPA pointed out to this court, the assurance requirement at issue is hardly a precise, absolute standard. It comes closer to being simply an exhortation. The assurance requirements are not a primary protection mechanism, but are a backup designed to aid in achieving the primary protections—the containment requirements. We believe the EPA was acting well within its range of discretion when it concluded that the goal of this assurance requirement, to keep releases as small as reasonably achievable, would be independently and adequately achieved through the NRC and DOE rules, and that therefore the proposed requirement was unnecessary.

(4) The Containment Requirements' 10,000 Year Design Criteria

 Minnesota challenges EPA's adoption of the 10,000 year time frame for the assessment of disposal facility performance under the containment requirements, 40 C.F.R. § 191.13. Contending that the EPA has not provided a technical or scientific basis for the choice of 10,000 years, Minnesota asserts that this provision is arbitrary and capricious. We must reject this claim because we find that the Agency has provided an adequate explanation for its decision.

In the preamble to the proposed rules, the Agency explained that it chose 10,000 years for two reasons: first, because the choice of a shorter period for assessing repository effectiveness would give deceptively low estimates of long-term risks. *See* 47 Fed.Reg. 58,199 (Dec. 29, 1982).

Second, a time period greater than 10,000 years would necessarily be impacted by major unpredictable geologic changes. Thus, the 10,000 year period was chosen because it is "long enough to distinguish geologic repositories with relatively good capabilities to isolate wastes from those with relatively poor capabilities," *see* 50 Fed.Reg. 38,070, and yet this time period is short enough "so that major geologic changes are unlikely and repository performance might reasonably be projected." 50 Fed.Reg. 38,071. Thus, the 10,000 year period was chosen to give sufficiently reliable data; and as the Agency explained, scientifically reliable assessments are unattainable for longer periods of time. Moreover, the Agency believed that a disposal system capable of meeting the numerical containment requirements for 10,000 years would continue to protect the environment well beyond the initial 10,000 years.

The SAB subcommittee reviewed and supported the Agency's choice of 10,000 years, finding it a "scientifically acceptable regulatory approach." *See* Response to Comments, Vol. II, at 2–6. The SAB subcommittee stated that

Modeling and risk assessments for the time periods involved in radioactive waste disposal require extension of such developing techniques well beyond usual extrapolations; however, the extension for 10,000 years can be made with reasonable confidence. Also, the period of 10,000 years is likely to be free of major geologic changes, such as volcanism or renewed glaciation, and with proper site selection the risk from such changes can be made negligible.

SAB Report at 4.

The subcommittee further recommended that the process for selecting sites also take into account potential releases "somewhat beyond 10,000 years." *Id.* In response to this further recommendation, the EPA "worked closely" with the DOE and NRC in developing the siting provision, discussed *supra*, calling for DOE to compare releases from sites over a 100,000 year period. These comparisons between prospective sites are to be one of the signifi-

cant considerations in selecting sites according to the rule adopted by DOE. *See* 10 C.F.R. § 960.3–1–5.

Given the nature of this type of decision, which involves many unquantifiable variables, we believe that it was appropriately within the Agency's discretion. As the Supreme Court has stated, when an Agency's action involves scientific decisions "within its area of special expertise, at the frontiers of science," a reviewing court must be at its most deferential. *Baltimore Gas & Electric v. NRDC*, 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983). We affirm the Agency's decision to select 10,000 years for the repository assessment period as being rational, technologically based and within the Agency's discretion.

### (5) The Containment Requirements' Reasonable Expectation Of Compliance Provision

Minnesota also attacks the containment requirements' provision which requires only that a "reasonable expectation" of compliance with the containment requirements be shown. Minnesota asserts that the Agency's reliance on a reasonable expectation of compliance provides no assurance that the public health and environment will be protected, since, it asserts, this standard grants implementing agencies a range of discretion in determining whether the containment requirements will be met.

The Agency explained that unequivocal proof of compliance was not required because of the "substantial uncertainties inherent in such long-term projections." *See* Response to Comments, Vol. I, at 5–4. Since absolute proof is impossible to achieve, the Agency felt that the appropriate standard is "a reasonable expectation of compliance based upon practically obtainable information and analysis." *Id.*

Given that absolute proof of compliance is impossible to predict because of the inherent uncertainties, we find that the Agency's decision to require "reasonable expectation" of compliance is a rational one. It would be irrational for the Agency to require proof which is scientifically im-

possible to obtain. Any such purported absolute proof would be of questionable veracity, and thus of little value to the implementing agencies. Nor can we say that this provision is arbitrary and capricious because it will afford the implementing agencies a degree of discretion, since such imprecision is unavoidable given the current state of scientific knowledge. Thus we are again faced with a decision that is within the Agency's area of expertise and on the frontiers of science, and, as such, we refuse to substitute our judgment for that of the Agency.

## VII. CONCLUSION

Because the EPA did not consider the interrelationship of the high level waste rules and Part C of the Safe Drinking Water Act and thus failed either to reconcile the two regulatory standards or to adequately explain the divergence, we find that the Agency was arbitrary and capricious in its promulgation of the individual protection requirements. We must therefore remand to the Agency for further consideration. *See, e.g., Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983) (where agency failed to supply reasoned analysis for its decision, remand to agency for further consideration necessary); *Federal Power Commission v. Transcontinental Gas Pipe Line Corp.,* 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976) (where agency's decision not sustainable on administrative record, decision must be vacated and the matter remanded for further consideration). We are also remanding the individual protection requirements for further consideration because the Agency has not provided an adequate explanation for selecting the 1,000 year design criterion. Further, we find that the ground water protection requirements were promulgated without proper notice and comment as required by the Administrative Procedure Act, 5 U.S.C. § 553(c). We therefore remand for further notice and comment procedures. *See PPG Industries, Inc. v. Costle,* 659 F.2d 1239

(D.C.Cir.1981) (where EPA failed to fully meet notice requirements, remand was appropriate to allow agency to consider issues raised by parties in properly noticed rulemaking). We reject the petitioners' remaining challenges to the high level waste rules.

Accordingly, the petition for review of the HLW rules is granted with respect to the issues of the individual and ground water protection requirements, and is denied with respect to the remaining challenges. The HLW rules, 40 C.F.R. Part 191 (1986), except for Subpart A of 40 C.F.R. Part 191 (1986), are vacated and remanded to the Agency for further proceedings not inconsistent with this opinion.

*So ordered.*